James E. Cecchi
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

*Attorneys for Plaintiff*
*Additional Counsel on Signature Page*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOCAL 837 HEALTH AND WELFARE PLAN, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| ELI LILLY AND COMPANY; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; CVS HEALTH CORPORATION; CAREMARK, LLC; CAREMARKPCS HEALTH, LLC; EVERNORTH HEALTH, INC.; EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; MEDCO HEALTH SOLUTIONS, INC.; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMRX, INC.; and OPTUMINSIGHT, INC. | |
| Defendants. | |

# TABLE OF CONTENTS

I.    INTRODUCTION .......................................................................5

II.   PARTIES ...............................................................................16

      A.    Plaintiff...................................................................16

      B.    The Manufacturer Defendants............................................17

      C.    The PBM Defendants ....................................................18

            1.    CVS Caremark ..................................................18

            2.    Express Scripts.................................................23

            3.    OptumRx.........................................................29

III.  JURISDICTION AND VENUE ....................................................35

IV.   DRUG PRICING IN THE UNITED STATES .................................36

      A.    Entities Involved in Drug Pricing .....................................36

      B.    The Drug Payment & Distribution Structure .......................39

      C.    The PBM Defendants and Manufacturer Defendants
            Have Ample Opportunity to Coordinate Pricing .................41

      D.    Health Plans Reimburse Analog Insulin Purchases Based
            on AWP ...................................................................44

      E.    Defendants' Manipulation of PBM Incentives and
            Resulting Profits.........................................................47

      F.    Defendants Downplay the Pricing Scheme for Analog
            Insulins and its Resulting Harms to Congress....................55

V.    ANALOG INSULIN ...............................................................62

      A.    Diabetes: The Disease and Demographics...........................62

      B.    The Origins of Insulin Treatment.....................................65

      C.    Current Insulin Treatment Landscape ...............................73

D.  Climbing Insulin List Prices ................................................................. 75

E.  Eli Lilly, Novo Nordisk, and Sanofi Have Sold Increased Spreads to PBMs in Exchange for (or as a Kickback for) Preferred Formulary Status ................................................................. 90

F.  The Artificial Inflation of List Prices is Unfair, Inefficient, and Harms Plaintiff and Class members ........................ 100

VI.  TOLLING OF THE STATUTE OF LIMITATIONS ................................. 106

A.  Continuing Violations Doctrine ....................................................... 106

B.  Fraudulent Concealment Tolling ..................................................... 106

C.  Estoppel .......................................................................................... 106

VII.  CLASS ACTION ALLEGATIONS ............................................................ 107

VIII.  CLAIMS FOR RELIEF .............................................................................. 114

A.  Defendants are Culpable "Persons" Under RICO ............................ 115

B.  The Manufacturer-PBM Insulin Pricing RICO Enterprises ...................................................................................... 115

   1.  The Eli Lilly-PBM Enterprises ................................................ 120

   2.  The Novo Nordisk-PBM Insulin Pricing Enterprises ...................................................................................... 121

   3.  The Sanofi-PBM Insulin Pricing Enterprises ........................ 123

C.  The Manufacturer-PBM Insulin Pricing RICO Enterprises' of the U.S. Mails and Interstate Wire Facilities .......................................................................................... 126

D.  Conduct of the RICO Enterprises' Affairs ...................................... 129

E.  Defendants' Pattern of Racketeering Activity ................................ 131

F.  Defendants' Motive .......................................................................... 134

G.  Damages Caused by Defendants' Pricing Scheme ........................ 134

IX.    DEMAND FOR JUDGMENT ....................................................................204

X.    JURY DEMAND...........................................................................................205

Plaintiff, Local 837 Health and Welfare Plan, ("Plaintiff") on behalf of itself and all others similarly situated, for its Complaint against Defendants Eli Lilly and Company ("Eli Lilly"), Novo Nordisk Inc. ("Novo Nordisk"), and Sanofi-Aventis U.S. LLC ("Sanofi") (collectively, the "Manufacturer Defendants"), Defendants CVS Health Corporation, Caremark, LLC, CaremarkPCS Health, LLC, Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., UnitedHealth Group, Inc., Optum, Inc., OptumRx, Inc. and OptumInsight, Inc. (collectively, the "PBM Defendants") (together, the Manufacturer Defendants and PBM Defendants are referred to as "Defendants"), alleges the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I.    INTRODUCTION

1.    Plaintiff, a health benefit provider, brings this proposed class action against the three primary drug manufacturers of analog insulin—Eli Lilly, Novo Nordisk, and Sanofi, and the three pharmacy benefit managers ("PBMs") that control the vast majority of the prescription drug market—for the artificial, deceptive, and unfair manipulation of the list prices for analog insulin in the United States. The insulin medications at issue in this Complaint are Humalog, Basaglar, Fiasp, Novolog, Levemir, Tresiba, Apidra, Lantus, and Toujeo (the "Analog Insulins").

2.      The insulin market should be extremely competitive. Analog insulins have existed for decades, and they cost very little to produce. The Analog Insulins, which are produced and sold by the Manufacturer Defendants, are largely interchangeable. Accordingly, patients generally do not need to take one specific brand of insulin over the other to treat their diabetes, and health plans largely do not need to cover all of the Analog Insulins. Such market conditions should yield lower insulin costs for health plans and diabetics. But, because of Defendants' pricing scheme, described below, such competition has not occurred.

3.      Drugs sold in the pharmaceutical industry can have many prices throughout the supply chain. The price set by the manufacturer—the *list price* (also known as the wholesale acquisition cost or "WAC")—provides the basis for all prices set in the distribution chain. The Manufacturer Defendants, together with the PBM Defendants, employed a scheme to widen the spread between the publicly available list price and another secret price, the *net price*—or the price after subtracting rebates and discounts that the Manufacturer Defendants offered to the PBM Defendants.

4.      PBMs, including the PBM Defendants, represent health plans and act as third-party intermediaries when dealing with the drug manufacturers. In this role, PBMs create and maintain a list of drugs—called a formulary—that outlines the prescription medications the health plan will cover. PBMs profit when they can

negotiate lower prices for drugs on their respective clients' formularies through rebates, usually by retaining a percentage of the list price and rebates.

5.     When two or more branded medicines fall into the same therapeutic category and have similar effectiveness and safety profiles (as is the case with the Analog Insulins), a PBM may sometimes exclude, or place in a non-preferred position, one of the medications in favor of another. When a drug is excluded from formulary or placed in a non-preferred position, plan beneficiaries shoulder a greater percentage or all the disadvantaged product's cost. As a result, the PBM Defendants can push significant portions of the market towards or away from the Manufacturer Defendants' products in the branded analog insulin therapeutic category.

6.     PBMs typically make money in two ways. First, they keep the difference between what they pay pharmacies for drugs (a percentage of the list price plus dispensing costs) and what insurers pay them (a higher percentage of the list price plus dispensing costs). Second, PBMs pocket a portion of the difference between a drug's list price and the net price they negotiate with its manufacturer— i.e., the "spread" between prices. PBMs thus benefit both from higher list prices and larger spreads between list and net price. The higher the list price and the larger the spread between a drug's list and net price, the larger the PBM's profits. Given this, Defendants have created a pricing system that turns what would be normal economic competition on its head.

7.    Specifically, the Manufacturer Defendants have engaged in "shadow pricing," a tactic where they tacitly agree to follow each other's list price increases in near unison. Then, with identical list prices, the Manufacturer Defendants need only 'compete' through kickbacks to the PBM Defendants in the form of enormous rebates and fees. In other words, instead of lowering their *net* prices while keeping their *list* prices constant, the Manufacturer Defendants all raised their *list* prices in lockstep while keeping their *net* prices constant, as depicted below.

**Figure 1: Manufacturer Defendants increase rapid-acting insulin list prices in lock-step**



**Figure 2: Manufacturer Defendants increase long-acting insulin list prices in lock-step**



8.    This perverse form of competition has yielded absurd results. As many of the Analog Insulins get older, more alternatives emerge, and market conditions become more competitive, yet the Manufacturer Defendants' insulins become *more* expensive, not less. In recent years, to prop up their net price in the competitive landscape, Manufacturer Defendants have resorted to aggressive list price increases, in lockstep, to make room for more rebates to the PBM Defendants. In a five-year period alone, Eli Lilly, Novo Nordisk, and Sanofi raised their list prices by over 150%. List prices that used to be $75 fifteen years ago are now between $300 and

$700, and *nothing* about the Analog Insulins has changed in that period; the $600 drug is the exact same one the Manufacturer Defendants sold for $75 years ago.

9.     At the same time, and as a result of the increased list prices and rebates and fees of the PBMs, the PBMs' profit-per-prescription has grown exponentially. A recent study published in the Journal of the American Medical Association concluded that the amount of money that goes to the PBMs for each insulin prescription increased more than 150% from 2014 to 2018.[1]

10.     Thus, the list prices for the Analog Insulins have become meaningless and divorced from net price. They do not reflect marketplace value for the products or cutting-edge technology, nor do they reflect some increasing need to recoup investment. Rather, to the extent they are not completely arbitrary, they simply reflect the lengths to which the drug manufacturers have gone to avoid market forces and cater to the demands of the PBMs.

11.     But while this pricing scheme benefits Defendants, it harms health plans and patients. Health plans must reimburse pharmacies for their plan members' insulin purchases at a set rate *tethered to the list price* that the Manufacturer Defendants hike in unison. So, by creating a system where all of the competing

---

[1] Karen Van Nuys, *et al., Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies, and Health Plans From 2014 to 2018,* JAMA Network (Nov. 5, 2021), https://jamanetwork.com/journals/jama-healthforum/fullarticle/2785932.

products bear equally high list prices, Defendants have foisted the financial consequences of this perverse form of competition onto the very parties that should benefit from it.

12.    Defendants will point out that health plans often receive a portion of the rebates that the Manufacturer Defendants provide to the PBM Defendants, arguably mitigating the financial harm stemming from the higher list prices. But such a claim misunderstands the problem. Plaintiff, like the Class members it represents, receives and received rebates on a lump sum basis across all the drugs it purchases from a given pharmaceutical company (it does not receive individual rebates on specific drugs). Consequently, Plaintiff and like Class members have no way of ascertaining the true net prices of the Analog Insulins. This lack of transparency results in two harms.

13.    First, the lack of transparency obfuscates the difference between list and net prices such that the health plans, including Plaintiff, cannot ascertain whether the prices they pay for the Analog Insulins are fair and competitive.

14.    Second, this opaque dual pricing system has misled the plans into believing they are receiving a better deal on the Analog Insulins than they are actually receiving. The Manufacturer Defendants and the PBM Defendants have told health plans, like Plaintiff here, that they are benefitting from a system of high list prices and rebates—that the health plans are obtaining lower prices for the Analog

Insulins than they would absent the rebates. This narrative is wrong. If Defendants were required to publish a list price that approximated the true net prices, Defendants would have to start competing through significantly lower net prices, rather than significantly inflated list prices. Despite selling interchangeable products, Defendants have managed to escape the usual consequence of competition: lower prices. Their list price manipulation has enabled them to keep their net prices the same for decades, despite stiff competition. Clear, transparent pricing would force Defendants to compete on, and therefore lower, net price, benefiting both Plaintiff and consumers.

15.     All of the Defendants have participated in this arms-race escalation of reported list prices and spreads. What's more, they admit it.[2]

16.     Olivier Brandicourt, the former-CEO of Sanofi, acknowledged the growing gap between list price and net price in sworn testimony before the United States Senate Finance Committee:

> Since 2012, the net price of Sanofi insulins has declined 25 percent. Yet patient out of pocket costs have continued to rise. If you take Lantus, for instance, our most prescribed insulin, the net price has fallen by 30 percent since 2012. Yet over the same period, average out-of-pocket costs have risen approximately 60 percent for patients with commercial insurance and Medicare. It is my belief that declining net prices should

---

[2] U.S. Senate Finance Comm., *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug* (Staff Rept. 2021), at 66 n.344.

result in lower out-of-pocket costs for patients. But clearly this is not always the case.[3]

17.    In written remarks in connection with an April 10, 2019 U.S. House of Representatives Committee on Energy and Commerce hearing, Doug Langa, Novo Nordisk's President, similarly recognized "misaligned incentives" that have led to higher drug costs, including for insulin: "Chief among these misaligned incentives is the fact that the rebates pharmaceutical companies pay to PBMs are calculated as a percentage of WAC [list] price. That means a pharmaceutical company fighting to remain on formulary is constrained from lowering WAC price, or even keeping the price constant, if a competitor takes an increase. This is because PBMs will then earn less in rebates and potentially choose to place a competitor's higher-priced product on their formulary to the exclusion of others."

18.    Defendants indeed have a long history of having to defend deceptive pricing. In a similar case from nearly 20 years ago, defendant drug manufacturers "repeatedly asserted that they had no duty to disclose what was publicly known to everyone, that is, that the [drug's list price] was a 'sticker price' and never intended to reflect the drug's true average wholesale price."[4] But the district court saw through

---

[3] Drug Pricing in America: A Prescription for Change, Part II, Hearing before the Committee on Finance United States Senate (Feb. 26, 2019), at 16.

[4] *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 168 n.19 (D. Mass. 2003).

this argument: "There is a difference between a sticker price and a sucker price. . . . The [plaintiffs] . . . have it exactly right: '[I]f everything [about the drug] was known to everybody, why did [d]efendants emphasize secrecy?'"[5] As the court explained, the "defendants trumpeted a lie by publishing the inflated [list prices], knowing (*and intending*) them to be used as instruments of fraud."[6]

19.    In this case, Defendants knew that the list prices for the Analog Insulins served as the basis for health plan payments. But, the PBM Defendants still sought larger and larger spreads and the Manufacturer Defendants still published artificially inflated list prices for the Analog Insulins in a scheme that unfairly deprived health plans and patients the benefits of competition. This constitutes an unfair and unconscionable practice.

20.    Defendants' actions harm the Class that Plaintiff seeks to represent: health plans who pay and/or reimburse pharmacies and PBMs that maintain mail-order pharmacies for Analog Insulin purchases based on the drugs' list prices. Plaintiff, like the proposed class it represents, offers health benefits to insulin-dependent patients. One of the key benefits it provides to its members is coverage of their drug costs. When a participant goes into a pharmacy to purchase an insulin, her health plan pays for a sizable portion of that prescription, and the health plans, like

---

[5] *Id.*

[6] *Id.* at 167.

Plaintiff here, pay for that prescription based on *list* price. This formula is set out in contracts between the health plan Class member and the pharmacy or PBM. Thus, Plaintiff and the proposed Class members' purchases, at the point of sale, are based on the Manufacturer Defendants' list prices. The price reductions the Manufacturer Defendants offer the PBM Defendants *are not reflected* in the negotiated rates Plaintiff is charged for their covered participants' purchases. Thus, the larger the list price, the larger the amount Plaintiff is charged. Each of the Defendants were aware of the impact the list price increases, for the Analog Insulins, had on health insurer payments to pharmacies.

21. The Manufacturer Defendants publicly represent that the list prices of the Analog Insulins are just that, *list* prices—a fair representation of the product's value in the market and a reasonable basis for consumer and health plan payments. So, when they inflate their list prices to arbitrary levels, solely to provide increased rebates in exchange for formulary access, they mislead Plaintiff and Class members and unfairly force them to reimburse pharmacies for their Analog Insulins at grossly inflated rates. Meanwhile, the PBM Defendants publicly represented that they were negotiating with the Manufacturer Defendants on behalf of health plans to keep costs down, but instead participated in a scheme that served to inflate list prices and increase the amounts paid by health plans.

22.    As a result of Defendants' conduct, Plaintiff and Class members overpaid for the relevant insulins when they paid for these medications based on their list prices. The amount they overpaid is the difference between their share of the list price, inflated by the pricing scheme, and the percentage of that share that reasonably tracked the drug's true net price.

23.    This action alleges that Defendants violated various state consumer protection laws by engaging in a deceptive and unfair pricing scheme with respect to the Analog Insulins. As to health plans who purchase from PBM-owned mail-order pharmacies, this action alleges a violation of the Racketeer Influenced Corrupt Organization Act ("RICO"), as, in this instance, health plans purchased Analog Insulins directly from a RICO-enterprise headed by Defendants. This scheme directly and foreseeably caused, and continues to cause, health plans and third party payors to overpay for the Analog Insulins their insured members need.

## II.    PARTIES

### A.    Plaintiff

24.    Local 837 Health and Welfare Plan is headquartered, with its principal place of business, in Philadelphia, Pennsylvania. Plaintiff is in the business of providing health benefits for its members. During the Class Period, Plaintiff paid for certain of the Analog Insulins based on the artificially inflated list prices. Plaintiff

will continue to purchase the Analog Insulins in the future. As a result, Plaintiff has been injured.

### B.    The Manufacturer Defendants

25.    Defendant Eli Lilly and Company is a corporation organized and existing under the laws of the State of Indiana. Eli Lilly's principal place of business is Lilly Corporate Center, Indianapolis, Indiana 46285. Eli Lilly manufactures Humalog and Basaglar, which are used for the treatment of diabetes. Eli Lilly's revenues from Humalog were $2.06 billion in 2022 and $2.45 billion in 2021.

26.    Defendant Novo Nordisk Inc. is a Delaware corporation and has its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536. Novo Nordisk manufactures Fiasp, Novolog, Levemir, and Tresiba, which are used for the treatment of diabetes. Novo Nordisk's net sales of all its insulin products totaled €38.76 billion DKK (or approximately $5.61 billion) in 2022 and €39.94 billion DKK (or approximately $5.78 billion) in 2021.

27.    Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807. Sanofi manufactures Apidra, Lantus, and Toujeo, which are used for the treatment of diabetes. Sanofi's net sales from Lantus were €2.25 billion (approximately $2.44 billion) in 2022 and €2.49 billion (approximately $2.7 billion)

in 2021. Sanofi's SEC Form 20-F for the year 2022 notes that "Lantus is particularly important; it was one of Sanofi's leading products in 2022 . . . ."

### C.    The PBM Defendants

#### 1.    CVS Caremark

28.    Defendant CVS Health Corporation ("CVS Health") is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.

29.    CVS Health—through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice Presidents, and Chief Communication Officers—is directly involved in creating and implementing the company policies that inform its PBM services and formulary construction, including with respect to the pricing scheme.

30.    On a regular basis, CVS Health executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

31.    In each annual report for at least the last decade, CVS Health (or its predecessor) has repeatedly and explicitly stated that CVS Health itself:

a.    designs pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members;

b.    negotiates with pharmaceutical companies to obtain discounted acquisition costs for many of the products on CVS Health's drug lists, and these negotiated discounts enable CVS Health to offer reduced costs to clients; and

     c.    utilizes an independent panel of doctors, pharmacists and other medical experts, referred to as its "Pharmacy and Therapeutics Committee," to select drugs that meet the highest standards of safety and efficacy for inclusion on its drug lists.[7]

32.    CVS Health publicly represents that it lowers the cost of the Analog Insulins. For example, in 2016 CVS Health announced a new program to "reduce overall health care spend[ing] in diabetes", stating that CVS Health introduced:

> [A] new program available to help the company's pharmacy benefit management (PBM) clients improve the health outcomes of their members, **lower pharmacy costs** [for diabetes medications] through aggressive trend management and decrease medical costs . . . [and that] participating clients could save between $3,000 to $5,000 per year for each member who successfully improves control of their diabetes. (emphasis added).[8]

33.    A 2017 CVS Health report stated that "CVS Health pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year the lowest in five years. Despite manufacturer price increases of near 10 percent, CVS Health kept drug price growth at a minimal 0.2 percent."[9]

---

[7] CVS Health Annual Report (Form 10-K) (FYE Dec. 31, 2009-2022).

[8] CVS Health, *CVS Health Introduces New "Transform Diabetes Care™" Program to Improve Health Outcomes and Lower Overall Health Care Costs* (Dec. 13, 2016), https://www.prnewswire.com/news-releases/cvs-health-introduces-new-transform-diabetes-care-program-to-improve-health-outcomes-and-lower-overall-health-care-costs-300377101.html.

[9] *See* CVS Health Drug Trend Report (2017), https://s2.q4cdn.com/447711729/files/doc_downloads/company_documents/2017-drug-trend-report.pdf.

34.    In November 2018, CVS Health acquired Aetna for $69 billion and became the first combination of a major health insurer, PBM, and mail-order and retail pharmacy chain. As a result, CVS Health controls the health plan/insurer, the PBM, and the pharmacies utilized by approximately 40 million Aetna members in the United States. CVS Health controls the entire drug pricing chain for these 40 million Americans.

35.    CVS Health is the immediate or indirect parent of many pharmacy subsidiaries that own pharmacies throughout the country—including CVS Pharmacy, Inc.—that dispensed and received payment for the Analog Insulins throughout the relevant period. According to CVS Health's 2022 Form 10-K filed with the U.S. Securities and Exchange Commission, the company "maintains a national network of approximately 66,000 retail pharmacies, consisting of approximately 40,000 chain pharmacies (which include CVS Pharmacy locations) and approximately 26,000 independent pharmacies, in the United States."[10]

36.    Defendant Caremark, LLC is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark, LLC is a subsidiary of Caremark Rx, LLC, which is a subsidiary of Defendant CVS Health.

---

[10] CVS Health Annual Report (Form 10-K) (FYE Dec. 31, 2022).

37.    During the relevant period, Caremark, LLC provided PBM services that gave rise to and implemented pricing scheme, which damaged payors.

38.    Defendant CaremarkPCS Health, LLC ("CaremarkPCS Health") is a Delaware limited liability company whose principal place of business is at the same location as CVS Health.

39.    CaremarkPCS Health is a subsidiary of CaremarkPCS, LLC, which is a subsidiary of Defendant CVS Health.

40.    CaremarkPCS Health, doing business as CVS Caremark, provides pharmacy-benefit-management services.

41.    During the relevant period, CaremarkPCS Health provided PBM services, which gave rise to and implemented the pricing scheme, which damaged payors.

42.    Defendants CVS Health, Caremark, LLC, and CaremarkPCS Health, including all predecessor and successor entities, are referred to collectively as "CVS Caremark."

43.    CVS Caremark is named as a Defendant in its capacities as a PBM.

44.    In its capacity as a PBM, CVS Caremark coordinated with each of the Manufacturer Defendants regarding the price of the Analog Insulins, as well as for the placement of the Manufacturer Defendants' diabetes medications on CVS Caremark's formularies.

45.    CVS Caremark has the largest PBM market share based on total prescription claims managed.

46.    At all relevant times, CVS Caremark offered pharmacy-benefit services to payors nationwide, and derived substantial revenue therefrom, and, in doing so, (a) made misrepresentations while concealing the pricing scheme for the Analog Insulins, and (b) utilized the artificially inflated prices generated therefrom.

47.    At all relevant times, CVS Caremark offered PBM services nationwide and maintained standard formularies that were used nationwide. Those formularies included diabetes medications, including the Analog Insulins.

48.    During the relevant period, CVS Caremark made representations to payors through proposals to provide PBM services in response to requests for proposals. In doing so, CVS Caremark reinforced the artificially inflated list prices for the Analog Insulins.

49.    At all relevant times, CVS Caremark had express agreements with Novo Nordisk, Sanofi, and Eli Lilly related to rebates and other payments paid by the Manufacturer Defendants to CVS Caremark.

### 2.    Express Scripts

50.    Defendant Evernorth Health, Inc. ("Evernorth"), formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at One Express Way, St. Louis, Missouri 63121.[11]

51.    Evernorth, through its executives and employees, including its CEO and Vice Presidents, is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the pricing scheme for the Analog Insulins.

52.    On a regular basis, Evernorth executives and employees communicate with and direct Evernorth's subsidiaries related to the at-issue PBM services and formulary activities.

53.    In 2018, Evernorth merged with Cigna in a $67 billion deal to consolidate their businesses as a major health insurer, PBM, and mail-order pharmacy. As a result, the Evernorth corporate family controls the health plan/insurer, the PBM, and the mail-order pharmacies utilized by approximately 15 million Cigna members in the United States. Evernorth controls the entire drug pricing chain for these 15 million Americans.

---

[11] Until 2021, Evernorth Health, Inc. operated under the name Express Scripts Holding Company. In this Complaint "Evernorth" refers collectively to Evernorth Health, Inc. and Express Scripts Holding Company.

54. Evernorth's annual reports over the past several years have repeatedly and explicitly:

a. Acknowledged that it is directly involved in the company's PBM services, stating "[Evernorth is] the largest independent [PBM] company in the United States."

b. Stated that Evernorth controls costs, including for example, that it: "identif[ies] products and offer[s] solutions that focus on improving patient outcomes and assist in controlling costs; evaluat[es] drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary; [and] offer[s] cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members." [12]

55. Even after the merger with Cigna, Evernorth "operates various group purchasing organizations that negotiate pricing for the purchase of pharmaceuticals and formulary rebates with pharmaceutical manufacturers on behalf of their participants" and operates the company's Pharmacy Rebate Program while its subsidiary Express Scripts provides "formulary management services" that ostensibly "assist customers and physicians in choosing clinically-appropriate, cost-effective drugs and prioritize access, safety and affordability." In 2021, Evernorth reported adjusted revenues of $131.9 billion (representing 75.8% of Cigna Corporation's revenues), up from $116.1 billion in 2020.[13]

---

[12] Express Scripts Annual Reports (FY 2009-2019); Cigna Annual Report (Form 10-K) FYE 2020 & 2021.

[13] Cigna Annual Report (Form 10-K) (FYE Dec. 31, 2021).

56.    Defendant Express Scripts, Inc. is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

57.    Express Scripts, Inc. is the immediate or indirect parent of PBM subsidiaries that operates throughout the country and engaged in the conduct that gave rise to this action.[14]

58.    During the relevant period, Express Scripts, Inc. was directly involved in PBM services that gave rise to and implemented the pricing scheme for the Analog Insulins, which damaged payors.

59.    Defendant Express Scripts Administrators, LLC, doing business as Express Scripts and formerly known as Medco Health, LLC, is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Its principal place of business is at the same location as Evernorth.

60.    During the relevant period, Express Scripts Administrators, LLC provided the PBM services that gave rise to and implemented the pricing scheme that damaged payors.

61.    Defendant Medco Health Solutions, Inc. ("Medco") is a Delaware Corporation whose principal place of business is at the same location as Evernorth.

---

[14] Express Scripts Annual Report (Form 10-K, Exhibit 21.1) (FYE Dec. 31, 2018).

62.    In 2012, Express Scripts acquired Medco for $29 billion.

63.    Prior to the merger, Medco provided PBM services, which gave rise to and implemented the pricing scheme for the Analog Insulins, which damaged payors.

64.    Following the merger, all of Medco's PBM functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts, with all of Medco's payor customers becoming Express Scripts' customers. The combined company covered over 155 million lives at the time of the merger.

65.    At the time of the merger, on December 6, 2011, in his testimony before the Senate Judiciary Committee, David Snow, then-CEO of Medco, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined entity will achieve even greater purchasing volume discounts from drug manufacturers and other suppliers."[15]

66.    At the same time, the then-CEO of Express Scripts, George Paz, provided written testimony to the Senate Judiciary Committee's Subcommittee on Antitrust, Competition Policy and Consumer Rights, stating: "A combined Express

---

[15]    Transcript,    https://www.judiciary.senate.gov/imo/media/doc/11-12-6Snow Testimony.pdf (last visited Sept. 6, 2023).

Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines." First on Mr. Paz's list of "benefits of this merger" was "[g]enerating greater cost savings for patients and plan sponsors."[16]

67.     Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, and Medco Health Solutions, Inc., including all predecessor and successor entities, are referred to collectively as "Express Scripts."

68.     Express Scripts is named as a Defendant in its capacity as a PBM.

69.     In its capacity as a PBM, Express Scripts coordinates with each of the Manufacturer Defendants regarding the price of the Analog Insulins, as well as for the placement of these Manufacturer Defendants' diabetes medications on Express Scripts' formularies.

70.     Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States.[17] During the timeframe relevant to this Complaint, Express Scripts controlled 30% of the PBM market in the United States. Express Scripts has only grown larger since the Cigna merger.

71.     In 2017, annual revenue for Express Scripts exceeded $100 billion.[18]

---

[16]     Transcript,        https://www.judiciary.senate.gov/imo/media/doc/11-12-6Paz
Testimony.pdf (last visited Sept. 6, 2023).

[17] Express Scripts Annual Report (Form 10-k) (FYE Dec. 31, 2017).

[18] *Id.*

72.    As of December 31, 2017, more than 68,000 retail pharmacies, representing over 98% of all retail pharmacies in the nation, participated in one or more of Express Scripts' networks.[19]

73.    At all relevant times, and contrary to its express representations, Express Scripts knowingly insisted that its payor clients use the artificially inflated list prices as the basis for reimbursement of the Analog Insulins.

74.    At all times relevant hereto, Express Scripts concealed its critical role in the generation of those artificially inflated list prices.

75.    At all relevant times, Express Scripts offered pharmacy-benefit-management services nationwide and maintained standard formularies that are used nationwide. Those formularies included diabetes medications, including the Analog Insulins.

76.    During certain years when some of the largest at-issue price increases occurred, including in 2013 and 2014, Express Scripts worked directly with OptumRx to negotiate rebates and other payments on behalf of OptumRx and its clients in exchange for preferred formulary placement. For example, in a February 2014 email released by the U.S. Senate in conjunction with an investigation into insulin pricing, Eli Lilly describes a "Russian nested doll situation" in which Express

---

[19] *Id.*

Scripts was negotiating rebates on behalf of OptumRx related to the Analog Insulins for Cigna (who later would become part of Express Scripts).[20]

77.     At all relevant times, Express Scripts had express agreements with each of the Manufacturer Defendants related to rebates and other payments paid by the Manufacturer Defendants to Express Scripts.

### 3.     OptumRx

78.     Defendant UnitedHealth Group, Inc. is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

79.     UnitedHealth Group, Inc. is a diversified managed healthcare company. Its total revenues in 2022 exceeded $324 million. In 2021, its revenues exceeded $287 million. Since 2020, its revenues have increased by more than $30 million per year. The company currently is ranked fifth on the Fortune 500 list.[21]

80.     UnitedHealth Group, Inc. offers a spectrum of products and services including health insurance plans, PBM services and pharmacy services through its wholly owned subsidiaries.

---

[20] Senate Insulin Report; Letter from Joseph B. Kelley, Eli Lilly Vice President, Global Gov. Affairs, to Charles E. Grassley & Ron Wyden, S. Fin. Comm., https://www.finance.senate.gov/imo/media/doc/Eli%20Lilly_Redacted%20v1.pdf (last visited Sept. 6, 2023).

[21] UnitedHealth Group, Inc. Annual Report (Form 10-K) (FYE Dec. 31, 2022).

81.    Over one-third of UnitedHealth Group's total revenue is attributable to OptumRx, which operates a network of more than 67,000 pharmacies.

82.    UnitedHealth Group, through its executives and employees, is directly involved in the company policies that shape its PBM services and formulary construction, including with respect to the pricing scheme for the Analog Insulins. For example, UnitedHealth Group executives' structure, analyze, and direct the company's overarching policies, including as to PBM services, as a means of maximizing profitability across the corporate family.

83.    UnitedHealth Group's 2020 Sustainability Report states that:

> Its OptumRx business "works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create[s] tailored formularies – or drug lists – to ensure people get the right medications," and it "then negotiate[s] with pharmacies to lower costs at the point of sale." [22]

84.    In addition to being a PBM, UnitedHealth Group owns and controls a major health insurance company, UnitedHealthcare. As a result, UnitedHealth Group controls the health plan/insurer, the PBM, and the mail-order pharmacies utilized by more than 26 million UnitedHealthcare members in the United States. UnitedHealth Group controls the entire drug pricing chain for these 26 million Americans.

---

[22]    https://www.unitedhealthgroup.com/content/dam/UHG/PDF/sustainability/final/2020_Sustainabi lityReport.pdf (last visited Sept 6, 2023).

85.     UnitedHealth Group states in its annual reports that UnitedHealth Group "uses Optum's capabilities to help coordinate patient care, improve affordability of medical care, analyze cost trends, manage pharmacy care services, work with care providers more effectively and create a simpler and more satisfying consumer . . . experience."[23] Its most recent annual report states plainly that it is "involved in establishing the prices charged by retail pharmacies, determining which drugs will be included in formulary listings and selecting which retail pharmacies will be included in the network offered to plan sponsors' members[.]"[24]

86.     As of December 31, 2022 and 2021, UnitedHealth Group's "total pharmaceutical manufacturer rebates receivable included in other receivables in the Consolidated Balance Sheets amounted to $8.2 billion and $7.2 billion, respectively,"[25] up even from $6.3 billion in 2020.[26]

87.     Defendant Optum, Inc. is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc.[27]

---

[23] UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2022).

[24] *Id.*

[25] *Id.*

[26] UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2021).

[27] UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2022).

88.    Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the pricing scheme for the Analog Insulins.

89.    For example, according to an Optum, Inc. press releases, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform serving the broad health care marketplace, including care providers, plan sponsors, payers, life sciences companies and consumers."[28] In this role, Optum, Inc. is directly responsible for the "business units—OptumInsight, OptumHealth and OptumRx,"[29] and the CEOs of these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary construction.

90.    Defendant OptumRx, Inc. is a California corporation with its principal place of business at 2300 Main Street, Irvine, California, 92614.

91.    OptumRx, Inc. operates as a subsidiary of OptumRx Holdings, LLC, which, in turn, operates as a subsidiary of Defendant Optum, Inc.

92.    OptumRx, Inc. is, and since 2001 has been, registered to do business in New Jersey.

---

[28]    https://www.sec.gov/Archives/edgar/data/731766/000119312511182325/dex991.htm.

[29] *Id.*

93.     During the relevant period, OptumRx, Inc. provided the PBM services that gave rise to and implemented the pricing scheme for the Analog Insulins.

94.     Defendant OptumInsight, Inc. ("OptumInsight") is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

95.     OptumInsight is an integral part of the pricing scheme and, during the relevant period, coordinated directly with the Manufacturer Defendants in furtherance of the pricing scheme. OptumInsight analyzed data and other information from the Manufacturer Defendants to advise the other Defendants about the profitability of the pricing scheme to the benefit of all Defendants.

96.     Defendants UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight, and Optum, Inc., including all predecessor and successor entities, are referred to collectively as "OptumRx."

97.     OptumRx is named as a Defendant in its capacity as a PBM.

98.     OptumRx is a PBM and, as such, coordinates with each of the Manufacturer Defendants regarding the price of Analog Insulins, as well as for the placement of these manufacturers' diabetes medications on OptumRx's drug formularies.

99.    "In 2022, OptumRx managed $124 billion in pharmaceutical spending, including $52 billion in specialty pharmaceutical spending."[30]

100.    For the years 2018 through 2022, OptumRx managed $91 billion, $96 billion, $105 billion, $112 billion, and $124 billion in pharmaceutical spending, respectively.[31]

101.    In 2019, OptumRx's revenue (excluding UnitedHealthcare) totaled $74 billion. By 2022, it had risen to over $99 billion.[32]

102.    At all relevant times, OptumRx offered PBM services nationwide and maintained standard formularies that are used nationwide. Those formularies included diabetes medications, including the Analog Insulins.

103.    At all relevant times, and contrary to its express representations, OptumRx knowingly insisted that its payor clients use the artificially inflated list prices as the basis for reimbursement of the Analog Insulins.

104.    At all relevant times, OptumRx concealed its critical role in the generation of those artificially inflated list prices.

---

[30] UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2022).

[31] UnitedHealth Group Annual Report (Form 10-K) (FYE Dec. 31, 2018-2022).

[32] *Id.*

105.   At all relevant times, OptumRx had express agreements with each of the Manufacturer Defendants related to the rebates and other payments paid by the Manufacturer Defendants to OptumRx.

106.   As set forth above, CVS Caremark, OptumRx, and Express Scripts are referred to collectively as the "PBM Defendants."

## III.    JURISDICTION AND VENUE

107.   This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant. Finally, this Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

108.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in the District of New Jersey, and because some of the actions giving rise to this Complaint took place within this district.

109.   The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed the alleged pricing scheme throughout the United States, including in this

District. Defendants' unfair and unlawful conduct has been directed at, and has had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the United States, including in this District.

## IV.    DRUG PRICING IN THE UNITED STATES

### A.    Entities Involved in Drug Pricing

110.    The prescription drug industry consists of a network of entities, including pharmaceutical companies, wholesalers, pharmacies, health benefit providers (institutional insurers, self-insured employers, health and welfare plans), PBMs, and patient-consumers.

111.    ***Pharmaceutical Companies***. Pharmaceutical companies (also known as drug companies or drug manufacturers) own the rights to manufacture and market drugs. This remains true even if these companies contract out the actual production of their drugs. Pharmaceutical companies typically own or contract with facilities that manufacture drugs and then sell their products to wholesalers. Critically, pharmaceutical companies set the prices of their drugs and then those prices are used to calculate payments consumers and health plans pay for and/or make at the pharmacy at the point of sale. The Manufacturer Defendants here are pharmaceutical companies.

112.    ***Wholesalers***. After production, the Manufacturer Defendants send their drugs to FDA-registered drug wholesalers for further distribution. Wholesalers

purchase inventory and sell pharmaceutical products to a variety of providers, including retail pharmacy outlets, hospitals, and clinics.

113. **_Retail Pharmacies._** Retail pharmacies purchase drugs from the wholesalers. They then sell these drugs to consumers. When a retail pharmacy (a pharmacy with a physical location) sells a drug to a consumer, it looks up whether or not that consumer holds health insurance and then charges the consumer a price depending on his or her insurance status. Consumers with insurance are usually only responsible for a paying a portion of the drug's cost, with the health plan picking up the remainder of the bill.

114. **_Health benefit providers_**. Health benefit providers include institutional insurers, self-insured employers, and health and welfare plans. These plans submit payments on behalf of insured individuals to healthcare providers for services rendered to those individuals. Health insurers also cover a portion of their beneficiaries' drugs costs, submitting payments to pharmacies on behalf of their members. The term "health insurers" includes public and private entities, the latter of which includes self-insured businesses, insurance companies, union-run health plans, and private plans that sponsor Medicaid and Medicare drug benefits. Plaintiff and the proposed Class are self-insured health benefit providers who bear the risk and cost of their members' purchases.

115. ***Pharmacy Benefit Managers***. PBMs effectuate financial and contractual arrangements between drug manufacturers, pharmacies, and health insurers. In this role, PBMs perform a variety of services on behalf of their health insurer clients, including the negotiation of rebates with drug companies, creation of formularies, management of prescription billing, setting the prices in coordination with manufacturers that payors will pay for prescription drugs, construction of retail pharmacy networks for insurers, and provision of mail-order services. Nonetheless, they generally are not a direct link in the physical supply chain for pharmaceutical products because, in most instances, they do not take possession or control of prescription drugs. The PBM Defendants are the largest PBMs. Together, they cover roughly 80 to 85 percent of privately insured Americans.

116. There is one exception this general rule. PBMs sometimes run their own mail-order pharmacies where consumers can buy drugs directly from the PBMs and have those drugs shipped to them. For example, many diabetes patients purchase Analog Insulin through PBMs' mail-order pharmacies. Where PBMs run their own mail-order pharmacies, they do take possession of the drugs available for purchase in their mail-order pharmacies. In this situation, consumers and health plans, including Plaintiff, buy directly from the PBM.

117. Each of the PBM Defendants offers mail-order pharmacy services to be used by health plans and/or their participants to purchase the Analog Insulins.

- 38 -

**B.    The Drug Payment & Distribution Structure**

118.    *Distribution*.    Generally    speaking,    for    retail    pharmacy    channels,
branded prescription drugs are distributed from manufacturer to wholesaler,
wholesaler to retail pharmacy (or mail order), and retailer to patient.

119.    *Downstream charges*. The downstream charges are from manufacturer
to wholesaler, wholesaler to retailer (or mail order), and retailer (or mail order) to
the health benefit providers (in the form of reimbursement and dispensing fees) and
consumers (in the form of coinsurance, copayment, deductible payment, and/or
cash).

120.    *Upstream charges*. The upstream charges are from PBMs directly back
to the manufacturer. These upstream charges are price discounts the Manufacturer
Defendants offer PBMs in the form of "rebates." They typically occur well after the
point-of-sale transactions.

121.    The figure below illustrates this payment structure. This figure labels
certain payments "payment" and others "negotiated payment." The term "payment"
refers to individual payments, made at the time of delivery; for example, when a
patient walks into a pharmacy and picks up her prescription. At that moment, her
health plan—the Class here—also pays a service fee to its PBM for dispensing the
drug through its network of retail pharmacies. In contrast, a "negotiated payment" is
a payment made under a negotiated contract. For example, a PBM might negotiate

a contract with a drug manufacturer for supply of X drug for $Y per pill for a period of time. The figure also indicates the flow of products and rebates.

**Figure 3: The U.S. Drug Payment Structure[33]**



122.    When an insured consumer buys a medication from a pharmacy (a retailer), her insurer—the Class here—pays the pharmacy based on list price. Typically, they pay what's called the *average wholesale price* (or "AWP") minus some fixed percentage; and AWP itself is WAC (the list price set by the manufacturers) plus some fixed percentage. Importantly, the insurer's payment is based on the *list* price the drug manufacturer set for that drug.

---

[33] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html.

**C.    The PBM Defendants and Manufacturer Defendants Have Ample Opportunity to Coordinate Pricing**

123.    Each Manufacturer Defendant is a member of the industry group Pharmaceutical Research and Manufacturers of America ("PhRMA") and has routinely communicated via PhRMA meetings and platforms regarding the pricing of Analog Insulins.

124.    David Ricks (Eli Lilly's Chairman and CEO), Paul Hudson (Sanofi's CEO), and Douglas Langa (Novo Nordisk's President and EVP of North American Operations), serve on PhRMA's Board of Directors and/or as part of the PhRMA executive leadership team.

125.    The PBM Defendants also routinely communicate through direct interaction with their competitors and the Manufacturer Defendants at trade associations, including the Pharmaceutical Care Management Association ("PCMA") and industry conferences. Each of the PBM Defendants is a member of PCMA. The Manufacturer Defendants are each affiliate members of PCMA.

126.    PCMA is governed by PBM executives. As of August 2023, the Board of the PCMA included: Adam Kautzner (Express Scripts's President), Dr. Patrick Conway (OptumRx's CEO), and David Joyner (CVS Health's Executive Vice President and President of Pharmacy Services at CVS Health).

127.    Each year, high-level representatives and corporate officers from both the PBM Defendants and Manufacturer Defendants attend PCMA conferences to

meet in person and engage in discussions, including those related to the prices of Analog Insulins.

128.   In fact, for at least the last eight years, all Manufacturer Defendants have been "Partners," "Platinum Sponsors," or "Presidential Sponsors" of these PBM conferences. Many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications.

129.   Representatives from each Manufacturer Defendant have routinely met privately with representatives from each PBM Defendant during PCMA's Annual Meetings and Business Forum conferences each year. [34]

130.   In addition, all PCMA members, affiliates, and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community."

131.   The Manufacturer Defendants and PBM Defendants have utilized PCMA meetings as opportunities to arrange lockstep price increases.

132.   For example, just days after Defendants had met at PCMA's annual meeting on September 26 and 27, 2017, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list price by 5.4%, while Novo Nordisk

---

[34] PCMA, *PCMA-Connect*, https://www.pcmanet.org/contact/pcma-connect/.

recommended that their company make a 4% list price increase effective on January 1, 2018, to match the Sanofi increase.[35]

133.    Similarly, on May 30, 2014, a few weeks after PCMA's 2014 spring conference, Novo Nordisk raised the list price of Levemir a matter of hours after Sanofi made its list price increase on Lantus.[36]

134.    The PBM Defendants control the PCMA and have instituted numerous lawsuits and lobbying campaigns aimed at blocking drug-pricing transparency efforts, including recently suing the Department of Health and Human Services ("HHS") to block the finalized HHS "rebate rule," which would eliminate anti-kickback safe harbors for rebates and other payments from the Manufacturer Defendants to PBMs and instead offer them as direct-to-consumer discounts.

135.    Additionally, communications among the PBM Defendants are facilitated by frequent moves among executives from one PBM Defendant to another. For example:

    a.    Mark Thierer worked as an executive at Caremark Rx (now CVS Caremark) prior to becoming the CEO of OptumRx in 2016 (and also served as Chairman of the Board for PCMA starting in 2012);

---

[35] Charles E. Grassley, Ron Wyden, Staff Rep. of Comm. on Fin., 116th Cong., Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug 4 (Comm. Print 2021), https://www.finance.senate.gov/imo/media/doc/Insulin%20Committee%20Print.pdf.

[36] *Id.* at 47.

b.   Bill Wolfe was the President of the PBM Catalyst Rx (now OptumRx) prior to becoming the President of Aetna Rx in 2015 (and also served as a PCMA board member from 2015-2017 while with Aetna Rx);

c.   Derica Rice, former EVP for CVS Health and President of CVS Caremark, previously served as EVP and CFO for Eli Lilly;

d.   Duane Barnes was the Vice President of Medco (now Express Scripts) before becoming Division President of Aetna Rx in 2006 (and also served as a PCMA board member);

e.   Everett Neville was the Division President of Aetna Rx before becoming Senior Vice President of Express Scripts;

f.   Albert Thigpen was a Senior Vice President at CVS Caremark for 11 years before becoming a Senior Vice President at OptumRx in 2011;

g.   Harry Travis was the Chief Operating Officer at Medco (now Express Scripts) before becoming a Vice President at Aetna Rx in 2008; he also served as SVP Member Services Operations for CVS Caremark from 2020-2022; and

h.   h. Bill Kiefer was a Vice President of Express Scripts for 14 years before becoming Senior Vice President of Strategy at OptumRx in 2013.

**D.   Health Plans Reimburse Analog Insulin Purchases Based on AWP**

136.   A drug's list price—known as its Wholesale Acquisition Price (WAC) or the mathematically-related Average Wholesale Price (AWP) —is the starting point for drug payments in the pharmaceutical distribution system. For this reason, it is publicly available and listed in compendia by drug price aggregators like First Data Bank.

137.   The use of drug list prices to calculate and communicate reimbursement payments was supposed to create an efficient system through which drug costs could be shared among the various purchasers—plans, consumers, and wholesalers. The

purpose of a centralized price was to maintain the system's flexibility, minimize uncertainty through predictable costs, maximize coverage in a cost-effective manner, and provide a mechanism for competition among payors.

138.   Towards this end, health plans' reimbursement formulas are tied to AWP. When a consumer goes to a retail pharmacy (or the website of a mail order pharmacy) and requests to buy a drug, the pharmacy's computer system pulls up AWP, which is the list price the *manufacturer* of that drug set and published, plus an approximately 15-20% markup. The basis for that price is *not* determined by the pharmacy or the wholesaler that brought the drug to the pharmacy. Rather, the pharmacy's computer system taps into a database of prices that manufacturers created and published through third party publishers. The pharmacy's search for the drug's price is akin to a stockbroker's search for the price of a stock; the pharmacy, like the broker, does not and cannot change or influence the list price.

139.   When a consumer purchases a branded insulin, the consumer pays her portion of the cost (whether that be a co-pay, a co-insurance payment, or deductible payment), and her insurer or health plan pays the other portion. The pharmacy reimbursement is set by a formula negotiated between the pharmacy and the health plan (or the health plan's PBM, on behalf of the health plan) and based on AWP/WAC.

140.   The price benchmarks (i.e., AWP or WAC) used in their formulas are commonly adjusted by a percentage that is contractually set. For example, health insurer reimbursement to a pharmacy for an insulin could be determined based on the lower of the drug's (i) AWP – $x\%$, (ii) WAC + $y\%$, and (iii) payment cap.

141.   Despite some modifications to reimbursement policies over time, the most commonly and continuously used set of reference prices in reimbursement payment calculations and negotiations for retail channel drug transactions remains AWP.

142.   From an administrative perspective, AWP provides—or at least used to provide—a logical starting point for the calculation and communication of reimbursement to various pharmacy providers for various drugs. And given the historical use of AWP by all industry participants, one cannot discount the significance of AWP's entrenchment in the complex and highly automated payment system that is used to process billions of payments. As such, it is continued to be widely used to estimate costs and revenues.

143.   The Manufacturer Defendants' list prices also serve as the immovable reference point from which PBMs and drug manufacturers negotiate rebates. As previously explained, PBMs create formularies for their health insurer clients, and those formularies significantly influence patients' drug purchasing behavior. The

Manufacturer Defendants offer PBMs rebates—discounts off list prices—to influence the PBMs' formulary decisions.

### E.    Defendants' Manipulation of PBM Incentives and Resulting Profits

144.    The pricing scheme at issue here affords the Manufacturer Defendants the ability to pay the PBM Defendants secret, but significant, payments in exchange for formulary placement.

145.    This allows the Manufacturer Defendants to garner greater revenues from sales without decreasing their profit margins. The Manufacturer Defendants also use the inflated price to earn hundreds of millions of dollars in additional tax breaks by basing their deductions for donated insulins on the inflated list price.

146.    The PBM Defendants in turn make a profit in two primary ways relevant here: First, their health insurer clients pay them service fees for processing prescriptions and operating mail-order pharmacies. Second, PBMs take a cut of the drug price discounts they negotiate with drug companies (with the rest sometimes passed on to their health insurer clients). The manufacturers' "rebate" arrangements are meant to create an incentive for PBMs to negotiate lower *real* drug prices. But the Manufacturer Defendants know that this business model can be manipulated such that the PBM Defendants no longer have an incentive to control costs.

147.    As a 2022 report by the Community Oncology Alliance explains:

Among the different sources of revenue, the most prolific by far is in the form of rebates from pharmaceutical manufacturers that PBMs

extract in exchange for placing the manufacturer's drug(s) on a plan sponsor's formulary or encouraging utilization of the manufacturer's drug(s) . . . [T]he growing number and scale of rebates is the primary fuel of today's high drug prices. The truth is that PBMs have a vested interest in having drug prices remain high, and extracting rebates off these high prices. PBM formularies tend to favor drugs that offer higher rebates over similar drugs with lower net costs and lower rebates For the majority of prescription drug transactions, only the PBM Defendants are privy to the amount that any other entity in the supply chain is paying or receiving for drugs, granting Defendants the opportunity to extract billions of dollars from this payment and supply chain without detection.[37]

148.    Because of the increased list prices, and related payments, the PBMs' profit-per-prescription has grown exponentially during the relevant period as well. A recent study published in the Journal of the American Medical Association concluded that the amount of money that goes to the PBM Defendants for each insulin prescription increased more than 150% from 2014 to 2018.[38]

149.    Furthermore, rapid consolidation in the PBM industry has given the PBM Defendants considerable market power, controlling more than 80% of drug benefits for over 270 million Americans. The PBM Defendants harness this

---

[37] Community Oncology Alliance Formal Comments to FTC on Harm of Pharmacy Benefit Manager Integration (May 24, 2022), https://mycoa.communityoncology.org/education-publications/comment-letters /coa-formalcomments-to-ftc-on-harm-of-pharmacy-benefit-manager-integration (last visited Sept. 6, 2023).

[38] Karen Van Nuys, *et al.*, *Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies, and Health Plans From 2014 to 2018*, JAMA Network (Nov. 5, 2021), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2785932.

purchasing power as leverage when negotiating with other entities in the pharmaceutical supply chain.

150.   PBMs have the greatest leverage to negotiate lower prices when drugs are FDA-approved as bioequivalent or biosimilar, i.e., when a drug "goes generic." But PBMs also have leverage when two or more drug companies manufacture drugs that, while not bioequivalent or biosimilar, are nevertheless in the same therapeutic class and are perceived to have similar efficacy and risk profiles. That is the case with the Analog Insulins. In such a scenario, the drug companies should compete for formulary access by lowering their list prices.

151.   But Defendants have found a way to game this system. As Defendants have realized, the spread between net and list price can be enlarged by *raising list prices* while holding *net prices constant* (or decreasing them slightly). In exchange for this spread enlargement, the PBM Defendants agree with the Manufacturer Defendants, either explicitly or implicitly, to favor or at least not disfavor, the drug with the most elevated list price. The Manufacturer Defendants know that when they increase the list prices of their insulins, the PBM Defendants can earn substantially greater revenues so long as net prices remain constant.

152.   The perverse incentives for larger list prices (and consequent health plan overpayments), was described in a recent report on the drug industry:

At the whole-market level, we sense that the price protection rebate arbitrage game is driving manufacturers to higher list price increases than would otherwise occur, particularly on the eve of a general election. Price protection rebates between brand manufacturers and PBMs are common, as are fixed rebate agreements between PBMs and a significant portion of their plan sponsors. When brand manufacturers' [list price] increases exceed the price protection threshold, the manufacturers rebate the difference to PBMs, who pocket the difference when these price protection rebates grow faster than the PBMs' fixed rebate commitments to plan sponsors. Thus all else equal in a given category, the product with the more rapid list price increases is more profitable to the PBM. Manufacturers, realizing this, don't want their products disadvantaged, and accordingly are driven to keep their rates of list price inflation at least as high, and ideally just a bit higher, than peers'. Durable list price inflation is the natural result. Net price inflation is unaffected, but unit volumes suffer as higher list prices directly impact consumers who have not yet met their deductibles.[39]

153.  This is not the first-time manipulation of the spread between list and net prices has been the subject of large-scale litigation. In *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 244 F.R.P. 79 (D. Mass. 2007), the District Court for the District of Massachusetts certified a class alleging that McKesson, a wholesaler, and First Data, a drug price publisher, engaged in a scheme to inflate the list prices of brand name drugs. McKesson asserted that a class could not be certified because the PBMs had become aware of the phony increase in the spread, and promptly acted to offset the spread by vigorously seeking rebates for its health insurer clients. However, part of the evidence the district court relied upon in

---

[39] Richard Evans, Scott Hinds, & Ryan Baum, *US Rx Net Pricing Trends Thru 2Q16*, SSR LLC, 36 (Oct. 5, 2016).

rejecting this argument was evidence showing that the PBMs pocketed a portion of the increase in the spread at the expense of consumers and health insurers:

> Because these PBMs benefited from the increased [list price] spreads perpetuated by the Scheme, Plaintiffs argue that they had no incentive to inform [third party payers] of the inflated AWP, let alone fiercely compete to mitigate any damage. As proof, Plaintiffs quote an April 26, 2002 internal ESI e-mail, sent around the same time as the ESI letter, that states that "the AWP increases being pushed through by First Data Bank [are] having a very favorable impact on our mail margins." The e-mail goes on to state, "Our clients will not be sympathetic to our financial situation since we [will have benefited] from the AWP increase in the mail and they hired us to control drug trend." The e-mail includes a handwritten note, in response, "Let's put a lid on it and not make it a big deal."[40]

154.    Just so, Defendants here have used the phony list prices to their advantage. The Manufacturer Defendants use the spread between prices to provide kickbacks to the PBM Defendants in exchange for formulary status. Indeed, as the District Court for the District of Massachusetts explained, rebates are really "direct kickbacks," disguised as market-share discounts and rebates."[41] This pricing scheme enables Defendants to maintain preferred formulary positions without reducing their net prices.

---

[40] *New England Carpenters Health Benefits Fund v. First Data Bank, Inc.*, 248 F.R.D. 363, 367 (D. Mass 2008) (internal citations omitted).

[41] *United States ex rel. Banigan v. Organon USA Inc.*, 2016 WL 6571269, at *1 (D. Mass. Jan. 20, 2016).

155.    The Manufacturer Defendants understand that PBM Defendants make more money as prices increase. As the U.S. Senate Finance Committee has explained:

> [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price.[42]

156.    The Manufacturer Defendants also understand that because of the PBM Defendants' market dominance, most payors, accept the baseline national formularies offered by the PBMs with respect to Analog Insulins.

157.    Over the past several years, the Manufacturer Defendants have raised prices in unison and have paid correspondingly larger rebates and other price concessions to the PBM Defendants. In exchange for the Manufacturer Defendants artificially inflating their prices and paying the PBM Defendants substantial amounts, the PBM Defendants grant the Manufacturer Defendants' diabetes medications preferred status on their formularies. During the relevant period, the rebate amounts for Analog Insulins (as a proportion of the list price) grew year-over-year while list prices themselves increased.

---

[42] Charles E. Grassley & Ron Wyden, *Staff Report on Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug, Sen. Fin. Comm.*, at 6, 54, 55 (Jan. 2021), https://www.finance.senate.gov/chairmans-news/grassley-wyden-release-insulin-investigation-uncovering-business-practices-between-drug-companies-and-pbms-that-keep-prices-high.

158.   In addition to increased rebate demands, the PBM Defendants have also negotiated and received increasingly large administrative fees from the Manufacturer Defendants during the relevant period. These so-called administrative fees typically are based on a percentage of the drug price—as opposed to a flat fee— such that even if the actual "administrative" cost associated with processing two drugs is the same, the "administrative fee" would be correspondingly higher for the higher-priced drug, which again creates (by design) a perverse incentive to give preference to more expensive drugs.

159.   Moreover, the PBM Defendants' contracts with payors like Plaintiff narrowly define "rebates" by tying them to patient drug utilization. Thus, rebates for formulary placement (which are not tied to patient drug utilization) are characterized as "administrative fees" that are not remitted to payors. Such payments are beyond a payor's contractual audit rights because those rights are limited to "rebate" payments and these "administrative fees" have been carved out from the definition of "rebates."

160.   A recent study by the Pew Charitable Trust estimated that between 2012 and 2016 the amount of administrative and other fees that the PBMs received from

the Manufacturers **tripled**, reaching more than $16 billion.[43] According to the study, although rebates were sent to payors during this period, PBMs retained the same volume of rebates in dollar terms, due to the overall growth in rebate volume, while administrative fees and spread pricing further offset reductions in retained rebate volumes.

161.    Thus—and contrary to their public representations—the PBM Defendants' negotiations and agreements with the Manufacturer Defendants (and the formularies that result from these agreements) have caused and continue to cause precipitous price increases for Analog Insulins. The PBM Defendants benefit from the size of the spreads between list and net price. The PBM Defendants boast of the "increased rebates" they have achieved, when, in reality, the "discounts" they have obtained are simply reductions off artificially-inflated list prices. In other words, these "discounts" are not discounts at all.

162.    The losers in this scheme are Analog Insulin consumers and the health plans who pay higher prices for the Analog Insulins used by their participants. Defendants were well aware of the impact of their list prices on Plaintiff and Class members.

---

[43] The Pew Charitable Trusts, *The Prescription Drug Landscape, Explored* (Mar. 8, 2019), https://www.pewtrusts.org/en/research-and-analysis/reports/2019/03/08/the-prescription-drug-landscape-explored.

## F.    Defendants Downplay the Pricing Scheme for Analog Insulins and its Resulting Harms to Congress

163.    On April 10, 2019, the U.S. House of Representatives Committee on Energy and Commerce held a hearing on industry practices titled, "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."[44]

164.    Representatives from Defendants testified at the hearing and admitted that the price for insulin had increased exponentially over the past 15 years. Representatives for Defendants also conceded that the price that diabetics pay out-of-pocket for insulin is too high. For example:

a.    Dr. Sumit Dutta, SVP and Chief Medical Officer of OptumRx since 2015, testified: "A lack of meaningful competition allows the [M]anufacturers to set high [list] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs." [45]

b.    Thomas Moriarty, General Counsel for CVS admitted: "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, prices for insulin have increased nearly 50 percent. And over the last 10 years, list price of one product, Lantus, rose by 184 percent."[46]

---

[44] House Energy and Commerce Comm. Hearing on Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin, 116th Cong.(2019), *preliminary transcript,* https://www.congress.gov/116/meeting/house/109299/documents/HHRG-116-IF02-Transcript-20190410.pdf (last visited Sept. 6, 2023) (hereinafter. "Priced Out of a Lifesaving Drug").

[45] *Id.* at ¶¶ 919-24.

[46] *Id.* at ¶¶ 705-10.

c.  Mike Mason, Senior Vice President of Eli Lilly, testified when discussing how much diabetics pay out-of-pocket for insulin: "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications."[47]

d.  Kathleen Tregoning, Executive Vice President External Affairs at Sanofi, testified: "Patients are rightfully angry about rising out-of-pocket costs for many medicines and we all have a responsibility to address a system that is clearly failing too many people. . . we recognize the need to address the very real challenges of affordability . . . [S]ince 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent . . ."[48]

e.  Doug Langa, Executive Vice President of Novo Nordisk, testified: "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the list prices of our medicines. We also know that list price matters to many, particularly those in a high-deductible health plan and those that are uninsured."[49]

165.  None of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased production costs or improved clinical benefit.

166.  Instead, the written testimony of Doug Langa, Novo Nordisk's President, recognized "misaligned incentives" that have led to higher drug costs, including for insulin: "Chief among these misaligned incentives is the fact that the rebates pharmaceutical companies pay to PBMs are calculated as a percentage of WAC [list] price. That means a pharmaceutical company fighting to remain on

---

[47] *Id*. at ¶¶ 461-63.

[48] *Id*. at ¶¶ 616-18, 643-44, 657-59.

[49] *Id*. at ¶¶ 531-35.

formulary is constrained from lowering WAC price, or even keeping the price constant, if a competitor takes an increase. This is because PBMs will then earn less in rebates and potentially choose to place a competitor's higher-priced product on their formulary to the exclusion of others."[50] Likewise, Mr. Langa's responses to questions for the record conceded that "[t]he disadvantage of a system in which administrative fees are paid as a percentage of list price is that there is increased pressure to keep list prices high. . . ."[51] The hearing transcript records Mr. Langa's further comments in this regard:

> So as you heard last week from Dr. Cefalu from the ADA [American Diabetes Association], there is this perverse incentive and misaligned incentives and this encouragement to keep list prices high. And we've been participating in that system because the higher the list price, the higher the rebate . . . There is a significant demand for rebates . . . we're spending almost $18 billion a year in rebates, discount, and fees, and we have people with insurance with diabetes that don't get the benefit of that. (emphasis added)[52]

---

[50] Testimony of Douglas J. Langa, Comm. on Energy and Commerce (Apr. 10, 2019) https://www.congress.gov/116/meeting/house/109299/witnesses/HHRG-116-IF02-Wstate-LangaD-20190410.pdf.

[51] Questions for the Record Responses of Douglas J. Langa, Comm. on Energy and Commerce, Hearing on Priced Out of Lifesaving Drugs: Getting Answers on the Rising Cost of Insulin (Apr. 10, 2019), https://www.congress.gov/116/meeting/house/109299/witnesses/HHRG-116-IF02-Bio-LangaD-20190410-U2.pdf.

[52] Priced Out of a Lifesaving Drug, ¶¶ 987-91, 994, 1103-05

167.    Eli Lilly admitted that it raises list prices as a quid pro quo for formulary

positions.  At  the  April  2019  Congressional  hearing,  Mike  Mason,  Senior  Vice

President of Eli Lilly, testified:

> Seventy-five percent of our list price is paid for rebates and discounts . . . $210 of a vial of Humalog is paid for discounts and rebates. . . We have to provide rebates [to PBMs] in order to provide and compete for that [formulary position] so people can use our insulin.[53]

In the very next question, Mr. Langa of Novo Nordisk was asked: "[H]ave you ever

lowered a list price? His answer: "We have not."[54]

168.    Sanofi's  Executive  Vice  President  for  External  Affairs,  Kathleen

Tregoning, similarly testified:

> The rebates is [sic] how the system has evolved . . . I think the system became  complex  and  rebates  generated  through  negotiations  with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.[55]

169.    Her written response to questions for the record acknowledged that "it

is clear that payments based on a percentage of list price result in a higher margin

[for PBMs] for the higher list price product than for the lower list price product."[56]

---

[53] *Id.* at ¶¶ 979, 984-85, 1201-02.

[54] *Id.* at ¶¶ 1203-05.

[55] *Id.* at ¶¶ 1123, 2409-12.

[56] Questions for the Record Responses of Kathleen Tregoning, Comm. on Energy and Commerce, Hearing on Priced Out of Lifesaving Drugs: Getting Answers on the Rising  Cost  of  Insulin  (Apr.  10,  2019),  https://www.congress.gov/116/meeting /house/109299/witnesses/HHRG-116-IF02-Bio-TregoningK-20190410-U2.pdf.

170.   The PBM Defendants also conceded at the April 2019 Congressional hearing that they grant preferred, or even exclusive, formulary position because of the secret payments to them, made by the Manufacturer Defendants.

171.   For example, in her responses to questions for the record, Amy Bricker, former President of Express Scripts, a former PCMA board member, and now an executive at CVS Health, confirmed that "manufacturers lowering their list prices" would give patients "greater access to medications."[57] Yet when asked to explain why Express Scripts did not grant an insulin with a lower list price preferred formulary status, she answered: "Manufacturers do give higher discounts [i.e., payments] for exclusive [formulary] position . . ." When asked why the PBM would not include both costly and lower-priced insulin medications on its formulary, Ms. Bricker stated: "We'll receive less discount in the event we do that."[58]

172.   As Dr. Dutta, Senior Vice President of OptumRx, reasoned, the cheaper list-priced alternative Admelog is not given preference on the formulary because "it would cost the payer more money to do that . . . [b]ecause the list price is not what the payer is paying. They're paying the net price."[59] In other words, under the pricing

---

[57] Questions for the Record Responses of Amy Bricker, Comm. on Energy and Commerce, Hearing on Priced Out of Lifesaving Drugs: Getting Answers on the Rising Cost of Insulin (Apr. 10, 2019), https://www.congress.gov/116/meeting /house/109299/witnesses/HHRG-116-IF02-Bio-BrickerA-20190410-U2.pdf.

[58] Priced Out of a Lifesaving Drug, ¶¶ 1345-46, 1354-55.

[59] *Id*. at ¶¶ 1392-95.

scheme, PBMs and manufacturers can make a drug with a lower list price effectively more expensive for payors and then ostensibly save payors from that artificially inflated price by giving preference to drugs that had higher list prices to begin with (yielding higher payments to the PBMs).

173.    While all Defendants acknowledged before Congress their participation in conduct integral to the pricing scheme, none revealed its inner workings or the connection between their coordination and the economic harm that payors, like Plaintiff and its beneficiaries, were unwittingly suffering. Instead, to obscure the true reason for precipitous price increases, each defendant group pointed the finger at the other as the more responsible party.

174.    The PBM Defendants testified to Congress that the Manufacturer Defendants are solely responsible for their list price increases and that the payments that the PBMs receive are not correlated to rising insulin prices.

175.    This testimony is false. The amount the Manufacturer Defendants kick back to the PBM Defendants is directly correlated to an increase in list prices. On average, a $1 increase in payments to PBMs is associated with a $1.17 increase in list price.[60] Thus, reducing or eliminating the secret kickbacks to PBMs would lower prices and reduce out-of-pocket expenditures.

---

[60] Neeraj Sood, Rocio Ribero, Martha Ryan, Karen Van Nuys, USC Schaeffer, The Association Between Drug Rebates and List Prices (Feb. 11, 2020),

176.    Novo Nordisk's President, Doug Langa, submitted written testimony to Congress acknowledging "there is no doubt that the WAC [list] price is a significant component" of "what patients ultimately pay at the pharmacy counter."[61] Yet, the Manufacturer Defendants urged upon Congress the fiction that the PBMs were solely to blame for insulin prices because of their demands for rebates in exchange for formulary placement. The Manufacturer Defendants claimed their hands were tied and sought to conceal their misconduct by suggesting that they have not profited from rising insulin prices.

177.    Given the Manufacturer Defendants' claims that rebates were the sole reason for rising prices, each was asked directly during the Congressional hearing to guarantee it would decrease list prices if rebates were restricted or eliminated. The spokespersons for Eli Lilly, Novo Nordisk, and Sanofi all said only that they would "consider it."[62]

---

https://healthpolicy.usc.edu/research/the-association-between-drug-rebates-and-list-prices/.

[61] Testimony of Douglas J. Langa, Comm. on Energy and Commerce (Apr. 10, 2019) https://www.congress.gov/116/meeting/house/109299/witnesses/HHRG-116-IF02-Wstate-LangaD-20190410.pdf.

[62] Priced Out of a Lifesaving Drug, ¶¶ 2068, 2070, 2077-79.

## V.    ANALOG INSULIN

### A.    Diabetes: The Disease and Demographics

178.    Diabetes is an epidemic in the United States. One in five health care dollars is spent caring for people with diagnosed diabetes. Over 30 million people, 9.4% of the country, live with diabetes. A life-threatening disease, many of those living with diabetes rely on daily insulin treatments to survive. Interruptions to these regimes can have severe consequences, including sustained damage to the kidneys, heart, nerves, eyes, feet, and skin. Indeed, diabetes is the leading cause of kidney failure, adult-onset blindness, and lower-limb amputations in the United States. Missed or inadequate insulin therapy can leave diabetics with too little insulin in their system, triggering hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days. Diabetic ketoacidosis is responsible for more than 500,000 hospital days per year at an estimated annual direct medical expense and indirect cost of $2.4 billion.[63]

179.    The number of Americans who live with diabetes has exploded in the last half century. In 1958, only 1.6 million people in the United States had diabetes. By the turn of the century, that number had grown to over 10 million. Just 14 years later, the head count tripled again. Now over 30 million people—9.4% of the

---

[63] Abbas E. Kitabchi, et al., *Hyperglycemic Crises in Adult Patients with Diabetes*, 32 Diabetes Care 1335, 1335 (2009).

country—live with the disease. And this trend does not appear to be slowing: 86 million Americans have prediabetes, a health condition that significantly increases a person's risk of type 2 diabetes.

180.    Diabetes occurs when a person has too much glucose—sugar—in their blood stream. Normally, the human body breaks down ingested food into glucose, which in turn feeds cells and enables them to function. In this process, insulin functions as a key, opening the cells and permitting glucose to enter. A lack of insulin or responsiveness to insulin causes the process to break down. Glucose is unable to enter the cells, which leads to high blood sugar levels. Unchecked, high blood sugar levels in a non-diabetic can lead to type 2 diabetes.

181.    There are two basic types of diabetes. Roughly 90-95% of Americans living with diabetes developed the disease because they do not produce enough insulin, or have become resistant to the insulin their bodies do produce. Known as type 2, this more common form of diabetes is typically associated with increased body weight and is often developed later in life. When first diagnosed, many type 2 patients can initially be treated with tablets that help their bodies either secrete more insulin or better respond to the insulin they already produce. Nonetheless, these tablets are often insufficient for patients in the long term. To adequately control their blood sugar levels, many type 2 patients must inject insulin to supplement that which their bodies produce. About a quarter of type 2 patients rely on insulin treatment.

182.  Type 1 diabetes occurs when a patient completely ceases insulin production. This form of diabetes is usually diagnosed in children and young adults, but can occur at any age. In contrast to type 2 patients, people with type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die. Individuals living with type 1 must rely on insulin treatments from the point of diagnosis until death.

183.  If left untreated or under-treated, diabetes can become a debilitating and deadly disease. Indeed, it remains the seventh leading cause of death in the United States, despite the availability of effective treatment. People with diabetes are almost twice as likely to have heart disease or a heart attack and one and one-half times more likely to have a stroke as those without the disease. Chronic kidney disease and failure is also much more common among those with diabetes. Furthermore, diabetes damages blood vessels and nerves, leading to serious, hard-to-treat infections, and even amputations. Finally, the disease is the leading cause of blindness.

184.  The explosion in diabetes prevalence has hit minorities and the poor the hardest. Type 2 diabetes disproportionately impacts African-Americans, American Indians, Asian Americans, Hispanics/Latinos, and Pacific Islanders. For example, Native Americans are 420% more likely to die from diabetes-related causes of death than other Americans. With decreased access to nutritious food sources and fitness options, low-income individuals are at a greater risk of obesity and, correspondingly,

diabetes. These same demographic groups also account for a disproportionate share of the uninsured.

### B.   The Origins of Insulin Treatment

185.   Despite its potentially deadly impact, diabetes is a highly treatable illness. For patients who are able to follow a prescribed treatment plan consistently, the harmful symptoms and health complications associated with the disease are entirely avoidable. And what's more, unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

186.   In 1922, two men pioneered a technique for removing active insulin from an animal pancreas that could then be used to treat human patients with diabetes.

187.   A "widely celebrated tale of biomedical serendipity,"[64] this breakthrough is revered for two reasons. First, the duo that discovered how to extract insulin for patient treatment was an unlikely pair: a young orthopedic surgeon without laboratory training, Frederick Banting, and his medical-student assistant, Charles Best. Second, neither Banting nor Best applied for a patent on their game-changing innovation because they wanted to ensure their discovery remained open

---

[64] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

to the public, available to all. This decision offers a sad commentary on the state of the current pharmaceutical industry.

188.   Ironically, Banting and Best eventually ended up applying for a patent to guarantee access: Banting and Best realized that if they did not patent their drug, someone else would. To prevent others from obtaining exclusive rights and restricting supply, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 each. As they wrote to the University's president, the patent was a form of publication: "When the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[65]

189.   After selling their patent to the University of Toronto, university researchers attempted to manufacture insulin on campus. However, they quickly realized they lacked the facilities necessary to meet the demand. Therefore, to scale production, the University of Toronto teamed up with Eli Lilly, "an established pharmaceutical company with experience producing glandular extracts."[66] Under this arrangement, Eli Lilly was allowed to apply for U.S. patents on any improvements to the manufacturing process. In addition to their contract with Eli

---

[65] M. Bliss, *The Discovery of Insulin* (2013).

[66] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

Lilly, the Toronto team licensed the rights to produce insulin to a few other companies, including Denmark's Nordisk Insulin Laboratorium and Novo Terapeutisk Laboratorium.[67] Those initial licenses laid the groundwork for Eli Lilly and Nordisk's future domination over the sale of insulin products.

190.    Although the Toronto team's early iteration of insulin was immediately perceived as "a lifesaving drug of vast clinical public health significance,"[68] subsequent research led to further improvements in the drug's efficacy. The original animal insulin isolated by the Toronto team was short acting—it only had an effect on patient blood sugar levels for three to six hours. In the early 1930s, scientists at Nordisk discovered that the addition of a certain protein to insulin altered its absorption into the blood stream, prolonging its effect. This form of insulin became known as long-acting. A subsequent innovation in 1946—the addition of zinc to form the crystalline protamine-isophane insulin, now known as neutral protamine Hagedorn (NPH)—made it possible to combine long-acting and rapid-acting insulin. This advancement allowed many diabetes patients to take a single daily injection. Soon afterward, a method for prolonging the action of insulin without adding

---

[67] Nordisk and Novo merged in 1989 to form Novo Nordisk.

[68] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1172 (2015).

protamine was discovered. These developments offered new options for the dosing of insulin, but they also extended the reach of insulin patents into the 1970s.

191.    When the animal-based insulin patents finally began to expire, researchers took another step forward in the development of insulin technology. In the late 1970s, scientists began to produce human insulin through recombinant technology. By 1982, Eli Lilly brought the first recombinant human insulins— Humulin R (regular) and N (NPH)—to the U.S. marketplace. Around the same time, Novo and Nordisk developed methods for chemically converting bovine insulin into human insulin. In 1988, a year prior to merging, Novo and Nordisk obtained approval for their own recombinant insulin. This innovation allowed them to continue shared domination over insulin sales with Eli Lilly. It also enabled Eli Lilly and Novo Nordisk to spin a fresh web of insulin patents, promising to stretch into the 21st century.

192.    After the introduction of human insulin, an improved understanding of the human genetic code and recombinant technology put a third insulin development within reach. In the mid-1980s, scientists began to modify the molecular structure of insulin, attempting to improve its physiological effects. By 1996, Eli Lilly had obtained approval for Humalog (generic name, insulin lispro), the first rapid-acting, man-made insulin. This new type of insulin—known as an analog—allowed for faster absorption times. Never far behind, Novo Nordisk released its own rapid-

acting analog, Novolog (generic name, insulin aspart), in 2000. Four years after that, a third pharmaceutical company, Sanofi, released another rapid-acting analog, Apidra (generic name, insulin glulisine).

193.   The same technological advances that brought about rapid-acting analogs gave rise to long-acting analogs. In 2000, Sanofi released the first long-acting analog. This drug was branded as Lantus (generic name, insulin glargine). Five years later, Novo Nordisk gained approval for its own long-acting analog, Levemir (generic name, insulin detemir). The first patents on these long-acting analogs expired in June 2014, nearly a century after Banting and Best's first patent application in 1923.

194.   In February 2015, Sanofi launched a higher dosage of insulin glargine, branded as Toujeo (generic name, insulin glargine). In September 2015, Novo Nordisk released a fourth type of long-acting insulin called Tresiba (generic name, insulin degludec). In December 2016, Eli Lilly released its own version of insulin glargine, branded as Basaglar (generic name, insulin glargine). Basaglar is a follow-on product to Lantus.[69]

---

[69] It is not considered a generic drug because it did not rely on the Food, Drug, and Cosmetic Act's (FDCA) Abbreviated New Drug Application pathway—the normal pathway to generic entry—for approval. Instead, Basaglar was approved through a different FDCA pathway as a follow-on medication.

195.   In September 2017, Novo Nordisk released a fourth rapid-acting insulin called Fiasp (generic name, insulin aspart). Fiasp is a slightly modified version of Novolog. Table 2 summarizes the current insulin treatment landscape.

| Table 2: Insulin Available in the United States | | | | | | |
|---|---|---|---|---|---|---|
| Insulin Type | Action | Brand Name | Generic Name | Company | FDA Approval | List Price in 2019 (WAC) |
| Human | Rapid-acting | Humulin R | Insulin Regular | Eli Lilly | 1982 | $148.70 (vial[70]) |
| | | Novolin R | Insulin Regular | Novo Nordisk | 1991 | $137.70 (vial[71]) |
| | Intermediate | Humulin N | Insulin Suspension Isophane (NPH) | Eli Lilly | 1982 | $148.70 (vial[72]) |
| | | Novolin N | Insulin Suspension Isophane (NPH) | Novo Nordisk | 1991 | $137.70 (vial[73]) |

---

[70] Novolin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

[71] Novolin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

[72] Humulin N 100unit/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

[73] Novolin N 100units/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

| Table 2: Insulin Available in the United States | | | | | | |
|---|---|---|---|---|---|---|
| **Insulin Type** | *Action* | *Brand Name* | *Generic Name* | *Company* | *FDA Approval* | *List Price in 2019 (WAC)* |
| *Analogs* | **Rapid-Acting** | Humalog | Lispro | Eli Lilly | 1996 | $530.40 (pen[74]) $510.45 (vial[75]) |
| | | Novolog | Aspart | Novo Nordisk | 2000 | $558.83 (pen[76]) $289.36 (vial[77]) |
| | | Apidra | Glulisine | Sanofi | 2004 | $651.76 (pen[78]) $337.39 (vial[79]) |

---

[74] Humalog KwikPen 100unit/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Lispro 100U/1mL, Solution for injection) (2017).

[75] Humalog 100unit/ml Cartridge Solution for Injection (box, 5 cartridges, 3 ml Insulin Lispro 100U/1mL, Solution for injection) (2017).

[76] Novolog FlexPen Prefilled Syringe 100unit/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

[77] Novolog 100unit/ml Solution for Injection (vial, 10 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

[78] Apidra SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glulisine 100U/1mL, Solution for injection) (2018).

[79] Apidra 100unit/ml Solution for Injection (vial, 10 ml Insulin Glulisine 100U/1mL, Solution for injection) (2018).

| | | | Table 2: Insulin Available in the United States | | | |
| **Insulin Type** | *Action* | *Brand Name* | *Generic Name* | *Company* | *FDA Approval* | *List Price in 2019 (WAC)* |
|---|---|---|---|---|---|---|
| | | Fiasp | Aspart | Novo Nordisk | 2017 | $558.83 (pen[80]) $289.36 (vial[81]) |
| | **Long-Acting** | Lantus | Glargine | Sanofi | 2000 | $425.31 (pen[82]) $283.56 (vial[83]) |
| | | Levemir | Detemir | Novo Nordisk | 2005 | $462.21 (FlexTouch[84]) $308.14 (vial[85]) |
| | | Basaglar | Glargine | Eli Lilly | 2016 | $326.36 (pen[86]) |

[80] Fiasp FlexPen Prefilled Syringe 100unit/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

[81] Fiasp 100unit/ml Solution for Injection (vial, 10 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection) (2018).

[82] Lantus SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection) (2018).

[83] Lantus 100units/mL Solution for Injection (vial, 10 ml Insulin Glargine 100U/1mL, Solution for injection) (2018).

[84] Levemir FlexTouch 100units/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection) (2016).

[85] Levemir 100units/ml Solution for Injection (vial, 10 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection) (2018).

[86] Basaglar KwikPen 100units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection) (2017).

| Table 2: Insulin Available in the United States | | | | | | |
|---|---|---|---|---|---|---|
| Insulin Type | Action | Brand Name | Generic Name | Company | FDA Approval | List Price in 2019 (WAC) |
| | | Toujeo | Glargine | Sanofi | 2015 | $647.87 (pen[87]) |
| | | Tresiba | Insulin Degludec | Novo Nordisk | 2016 | $610.11 (pen[88]) |

## C.    Current Insulin Treatment Landscape

196.    Today, analogs dominate insulin sales. Doctors and patients prefer analogs because they more closely mimic the way the human body naturally absorbs insulin released by the pancreas. As a result, it can be used in more flexible ways.

197.    The American Diabetes Association—the organization responsible for setting guidelines for diabetes care in the United States—recommends analogs for treatment of individuals with both type 1 and type 2 diabetes.

198.    For type 1 patients, insulin analogs are unquestionably the best course of treatment. Doctors uniformly prescribe analogs for type 1 patients.

199.    For patients with type 2 diabetes, the American Diabetes Association describes long-acting analog insulin as the "most convenient initial insulin

---

[87] Toujeo SoloStar 300units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 1.5 ml Insulin Glargine 300U/1mL, Solution for injection) (2018).

[88] Tresiba Insulin Degludec 200units/mL Pre-Filled Pen Solution for Injection (box, 3 pens, 3 ml Insulin Glargine 200U/1mL, Solution for injection) (2018).

regimen."[89] Nonetheless, the organization notes that type 2 patients without a history of hypoglycemia (a condition caused by a drop in blood sugar level) can safely use cheaper, human insulins.

200.   But doctors still prefer to prescribe the Analog Insulins to type 2 patients. A recent study found that as of 2010, among adults who filled prescriptions for more than one brand of insulin, 91.5% filled prescriptions for insulin analogs. The study found that percentage has grown considerably since 2000, when only 14.8% of patients (who filled more than one prescription for insulin) filled prescriptions for analog insulin. Now, type 2 patients use human insulin less frequently: the study found that only 14.8% of type 2 adults taking insulin filled a prescription for human insulin in 2010, down from 96.4% in 2000.

---

[89] American Diabetes Association, *Approaches to Glycemic Care*, 38 Diabetes Care S52, S57 (2016), http://care.diabetesjournals.org/content/39/Supplement_1/S52?ijkey=07291605370b0a3e07418e06fb5e894fb4314f05&keytype2=tf_ipsecsh.

**Figure 8: Type of insulin used among U.S. adults with type 2 diabetes (who filled more than one prescription)[90]**



201.   In 2016, the top three selling insulins were all analogs: Sanofi's long-acting Lantus garnered $6.98 billion in sales; Novo Nordisk's long-acting Novolog: $3.03 billion; and Eli Lilly's rapid-acting Humalog: $2.84 billion.

### D.    Climbing Insulin List Prices

202.   Despite the availability of many highly effective insulins, too many people living with diabetes go without proper treatment for a familiar reason: cost.

---

[90] Kasia Lipska, et al., *Use and Out-of-Pocket Costs of Insulin for Type 2 Diabetes Mellitus from 2000 to 2010*, 311 J. Am. Med. Ass'n 2331, 2332 (2014).

203.   Eli Lilly raised the list prices of Humalog to $530.40 for a package of pens and $510.45 for a box of cartridges by the end of 2017. Eli Lilly also raised the list prices of Basaglar to $326.36 for a package of pens by the end of 2017. Figure 9 demonstrates Eli Lilly's price increases from 2006 to 2019 for Humalog, and Figure 10 illustrates Eli Lilly's price increases for Basaglar.

**Figure 9: Rising list prices of Humalog vials and pens from 2008-2021**



**Figure 10: Rising list prices of Basaglar pens from 2016-2021**



204.    Novo Nordisk's list prices for Levemir were $403.50 for a package of pens at the end of 2017 and $293.75 for a vial at the end of 2018. Novo Nordisk's list prices for Novolog sat at $558.83 for a package of pens and $289.36 for a vial at the end of 2018. Novo Nordisk's list prices for Fiasp also sat at $558.83 for a package of pens and $289.36 for a vial at the end of 2018. Novo Nordisk's list price for Tresiba was $484.68 for a package of pens at the end of 2018. Most diabetes patients need at least one package of insulin per month. Figures 11 and 12

demonstrate Novo Nordisk's price increases from 2006 to 2019 for Levemir and Novolog. And Figures 13 and 14 show Novo Nordisk's list price increases for Tresiba and Fiasp.

**Figure 11: Rising list prices of Levemir vials and pens from 2006-2021**



**Figure 12: Rising list prices of Novolog vials and pens from 2006-2021**



**Figure 13: Rising list prices of Tresiba pens from 2015-2021**



**Figure 14: Rising list prices of Fiasp pens from 2017-2021**



205.   Sanofi's list prices for Lantus, the top-selling analog insulin, sat at $404.29 for a package of pens and $269.54 for a vial at the end of 2018. Sanofi's list prices for Apidra were $521.41 for a package of pens and $269.91 for a vial at the end of 2018. Sanofi's list price for Toujeo was $620.57 for a package of Toujeo pens at the end of 2018. Figures 15 and 16 demonstrate Sanofi's price increases from 2006 to 2019 for Lantus and Apidra vial and pen packages. Figure 17 demonstrates Sanofi's list prices increases for Toujeo.

**Figure 15: Rising list prices of Lantus vials and pens from 2006-2021**



**Figure 16: Rising list prices of Apridra vials and pens from 2006-2021**



**Figure 17: Rising list prices of Toujeo pens from 2015-2021**



206.    The list prices of Analog Insulins have not always been so high. In just

the last five years, Sanofi and Novo Nordisk have raised Lantus's and Levemir's

reported prices an astounding 168% and 169%, respectively. In fact, in 2016, Novo

Nordisk and Sanofi were responsible for the highest drug list price increases in the

*entire pharmaceutical industry*. This distinction largely reflected their price hikes

for Lantus and Levemir. Figure 18 shows Eli Lilly, Novo Nordisk, and Sanofi's

exponential list price hikes from 2000 to 2015.

**Figure 18: Rising insulin list prices from 2000-2015[91]**



207.    Eli Lilly, Novo Nordisk, and Sanofi have not only dramatically increased their insulins' list prices in the last 15 years, they have done so in perfect lock-step. In thirteen instances since 2009, Sanofi and Novo Nordisk raised the list prices of their long-acting Analog Insulins, Lantus, and Levemir, in tandem, "taking the same price increase down to the decimal point within a few days of each other."[92] As one healthcare analyst put it: "That is pretty much a clear signal that your competitor doesn't intend to price-compete with you."[93] Eli Lilly, Novo Nordisk, and Sanofi have engaged in the same lock-step behavior with respect to their rapid-acting Analog Insulins, Humalog, Novolog, and Apidra, respectively.

---

[91] Rebecca Robbins, *The Insulin Market is Heading for a Shakeup. But Patients May Not Benefit*, STAT (Oct. 14, 2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/.

[92] Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2015).

[93] *Id.*

208.   An example from 2014 demonstrates this behavior and shows how Defendants inflated their list prices in ways that were completely untethered from their insulins' efficacy, value, or production costs. In May 2014, Novo Nordisk's U.S. Pricing Committee (PC) discussed how to respond to Sanofi's recent pricing actions. Farruq Jafery of Novo Nordisk emailed the rest of the pricing committee, stating "Sanofi took a price increase on Lantus effective today: 16.1% vial and 9.9% pen. Based on our PC discussion on 5/19/2014, we agreed that the best strategy for Levemir® is to observe the market and maintain list price parity to competitors. As such, we will be moving forward with a 16.1% increase on Levemir® vial and a 9.9% increase on Levemir FlexPen® and FlexTouch® effective tomorrow 5/31/2014." Novo Nordisk then followed through, matching Sanofi's list price increases precisely, to the tenth of a percent. And by doing so netted the company approximately $125 million in additional revenue.[94]

209.   Novo Nordisk continued to track Sanofi's pricing actions and responded with incredible speed. In November 2014, Sanofi again raised the list price of Lantus vials and pens 11.9%; within hours, Novo Nordisk's pricing committee sought (and ultimately received) approval to raise, by 11.9%, the price of

---

[94] Charles E. Grassley, Ron Wyden, *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, at 54.

Levemir.[95] Rich DeNunzio of Novo Nordisk estimated the increase would generate approximately an additional $25 million in revenue to the company in 2014 (despite the hike being taken at the end of the year).[96]

210.  Figures 19 and 20 demonstrate this shadow pricing behavior with respect to Lantus and Levemir, with the entry of Eli Lilly's Basaglar, Novo Nordisk's Tresiba, and Sanofi's Toujeo noted as well. Figures 21 and 22 demonstrate this behavior with respect to Novolog, Fiasp, Humalog, and Apidra.

**Figure 19: Rising list prices of long-acting insulins from 2006-2021**



_____

[95] _Id._ at 55.

[96] _Id._ at 56.

**Figure 20: Rising Lantus and Levemir list prices from 2001-2015**



**Figure 21: Rising list prices of rapid-acting insulin from 2006-2021**



**Figure 22: Rising Humalog and Novolog list prices from 1996-2016**



**E.    Eli Lilly, Novo Nordisk, and Sanofi Have Sold Increased Spreads to PBMs in Exchange for (or as a Kickback for) Preferred Formulary Status**

211.    In the past, Novo Nordisk maintained that its price increases reflected the "clinical benefit" of its drugs.[97] But Levemir and Novolog are the exact same drugs they were more than 10 years ago—the clinical benefits of these medications have not changed. Where clinical benefit has not changed, it cannot be used to justify a 169% price increase. Therefore, another factor motivates these list price increases.

---

[97] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html.

212.   Research and development costs do not account for these list price increases, as such have been a fraction of revenues. For example, during the period of 2014-2018, Sanofi reported net sales of $37 billion for its insulin products with R&D costs of $902 million. In the same time period, Eli Lilly spent $395 million on R&D with $1.4 billion in sales and marketing expenses on revenues of $22.4 billion.

213.   The real reason Eli Lilly, Novo Nordisk, and Sanofi have increased their list prices is because these firms choose to compete based on hidden rebates to PBMs, rather than transparent prices for all. PBMs control the formularies that determine whether people living with diabetes will purchase Eli Lilly, Novo Nordisk, and Sanofi's Analog Insulins. The Manufacturer Defendants have realized that they can manipulate the PBM Defendants' formulary choices by artificially inflating their list prices, rather than lowering net prices.

214.   Under pressure to explain its rising list prices, Novo Nordisk admitted to this behavior in a press release. On November 30, 2016, Novo Nordisk stated:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make . . . News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "list price" increases we've made over the last decade. In other words, a list price increase by **XX percent leads to an automatic XX percent profit** for the drug maker. We believe that is misleading and here's why: As the manufacturer, we do set the "list price" and have full accountability for those increases. However, after we set the list price, we negotiate with the companies that actually pay for the medicines, which we call payers. This is necessary in order for our medicines to

stay on their preferred drug list or formulary. The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price." The net price more closely reflects our actual profits.[98]

Explaining the company's list price increases, Novo Nordisk directly admitted that it "set[s] list price" with an eye to achieving "preferred" formulary status.

215.   For over a decade, Novo Nordisk has steeply raised the list prices of Levemir and Novolog while keeping the net prices of these medicines constant. Figures 23 and 24 (included in Novo Nordisk's press release) illustrate this conduct.

**Figure 23: Net versus List Prices of Novolog Vials[99]**



---

[98] Novo Nordisk Press Release (Nov. 30, 2016), http://press.novonordisk-us.com/leadership-perspectives?item=1.

[99] *Id.*

**Figure 24: Net versus List Prices of Novolog FlexPens[100]**



216.   Eli Lilly, too, has admitted that it raises list prices as a *quid pro quo* for formulary positions: "The reason drugmakers sharply raise list prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."[101]

217.   Sanofi has also conceded its participation in this pricing scheme:

[S]ince 2014, we have increased the level of rebates granted for Lantus® in order to maintain favorable formulary positions with key payers in the US.[102]

---

[100] *Id.* The FlexPen is a type of insulin injection. Patients who use this pen stick themselves with a pen-like insulin distributor instead of injecting insulin through a pump or syringe.

[101] Denise Roland & Peter Loftus, *Middlemen Fuel Insulin Price Rise*, Wall St. J., Oct. 10, 2016, at B1.

[102] Sanofi, Annual Report (Form 20-F) (Dec. 31, 2016).

218.   Sanofi's manipulation of its spreads is visible in Figure 25.

**Figure 25: Net versus List Price of Lantus**



219.   Eli Lilly's, Novo Nordisk's, and Sanofi's spread-increasing behavior is also visible from data on these companies' "rebates" to PBMs and insurers.

220.   The two figures below illustrate Eli Lilly's "rebates" from 2007 to 2014. Figures 26 and 27 show the amount Eli Lilly has increased its rebates (spreads) from 2007 to 2014.

**Figure 26: Eli Lilly's reported "rebates" as a percentage of U.S. gross sales from 2007-2014**



Source: Company data, Credit Suisse estimates

**Figure 27: Eli Lilly's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014**



Source: Company data, Credit Suisse estimates

221.   Novo Nordisk has also greatly increased its spreads. Figures 28 and 29 show the amount Novo Nordisk has increased its rebates (spreads) from 2007 to 2014.

**Figure 28: Novo Nordisk's reported "rebates" as a percentage of U.S. gross sales from 2007-2014**



**Figure 29: Novo Nordisk's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014**



*Source: Company data, Credit Suisse estimates*

222. Finally, Sanofi has greatly increased its spreads. Figures 30 and 31 show the amount Sanofi has increased its rebates (spreads) from 2007 to 2014.

**Figure 30: Sanofi's reported "rebates" as a percentage of U.S. gross sales from 2007-2014**



*Source: Company data, Credit Suisse estimates*

**Figure 31: Sanofi's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014**



Figure 82: SG&A and Rebates as % of US Gross

Source: Company data, Credit Suisse estimates

223. The arbitrary and deceptive nature of the Manufacturer Defendants' list prices are underscored by how they price drugs to achieve "parity" when a new product launches. One would expect when a new insulin hits the market, older insulins would become more affordable as some patients flock to the newer and ostensibly more desirable medicines. But the opposite happens. Instead, the Manufacturer Defendants *inflate* the price of their older insulin products so that they can launch the newer insulins at higher prices and still ensure that consumers switch to those newer, more expensive insulins. If the drug makers did not raise the list prices of their older medications, consumer would just stay on those medications rather than making the switch to the new ones. For example, in 2014, Sanofi aggressively began raising the list price of Lantus to achieve "a single price point

for Lantus . . . believing that it would remove cost as a barrier for switching patients to Toujeo to become the preferred basal insulin."[103]

224.   Sanofi and Novo Nordisk have stretched the spreads on their Analog Insulins to the point where they have become the second and third largest rebators in the entire pharmaceutical industry.

225.   Although the Manufacturer Defendants claim they "need" to inflate their list prices to obtain formulary status, this explanation omits a crucial detail. Drug companies could compete for formulary status in a manner that would help consumers and health plans: *they could significantly lower list (and net) prices*. Yet, the Manufacturer Defendants refuse to significantly lower their net prices, and the PBM Defendants continue to accept the Manufacturer Defendants' list-price-raising behavior so long as net prices stay constant.

226.   Indeed, upon facing pressure from lawmakers to lower their list prices in recent years, the Manufacturer Defendants analyzed the pros-and-cons of doing so. But Novo Nordisk, for example, lamented not being able to compete without massive rebates, and feared retaliation in the supply chain from PBMs and others

---

[103] Grassley &Wyden, *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, at 51.

who benefit from the practice of inflating list price, and then buying formulary access with rebates.[104]

### F. The Artificial Inflation of List Prices is Unfair, Inefficient, and Harms Plaintiff and Class members

227. The inflated list prices have harmed Class members. As the Manufacturer Defendants' list prices soared further and further away from their net prices, these list prices became so misrepresentative, so untethered from their true average prices, as to be unlawful.

228. The Manufacturer Defendants concealed their Analog Insulins' net prices to ensure that the PBM Defendants could and would benefit from the spreads between the net and list prices. Put another way, the Manufacturer Defendants' publication of their list prices, while concealing their net prices, is the basis for the *quid pro quo* with the PBM Defendants. Defendants' pricing scheme enabled the Manufacturer Defendants to offer something of value to the PBM Defendants (large spreads on which to make profits) in exchange for preferred formulary status. If the Manufacturer Defendants did not have these spreads to offer, they would have been forced to compete for preferred formulary status through lower list prices. Put simply, the Manufacturer Defendants would have competed for the PBM Defendants' business the way competitors do in healthy markets: by lowering the

---

[104] Grassley &Wyden, *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, at 62.

prices. Such competition would have benefited Plaintiff and Class members, who reimburse pharmacies based on AWP. But instead of competing on lower prices, each of the Manufacturer Defendants competed on a larger spread.

229.   To do so, the Manufacturer Defendants closely guarded their pricing structures and sales figures for the Analog Insulins. Each of the Manufacturer Defendants kept secret, the net prices it offered to the PBM Defendants.

230.   Each Defendant also concealed its fraudulent conduct by signing confidentiality agreements with those in the supply chain that knew the net prices.

231.   The PBM Defendants were complicit in artificially inflating the list price of the Analog Insulins.

232.   The PBM Defendants ensured that the Manufacturer Defendants' artificially inflated list prices harmed diabetics and payors by selecting the analog insulins with higher spreads (and higher list prices) for preferred formulary placement, and by forcing payors to pay based on the inflated prices.

233.   To further its purposes, the PBM Defendants have made misrepresentations about the Analog Insulins and the prices thereof, including:

   a.   In 2016, Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts, said in an interview with a national publication that "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges

created by this terrible disease."[105] Mr. Stettin also claimed that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."[106]

b.  In a public statement issued in November 2010, CVS Caremark represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."[107]

c.  In 2010, Andrew Sussman, Chief Medical Officer of CVS Caremark, stated on national television that "CVS is working to develop programs to hold down [diabetes] costs."[108]

d.  In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products "is one way the company helps manage costs for clients."[109]

e.  CVS Caremark's Chief Policy and External Affairs Officer claimed in the April 2019 hearings that CVS Caremark "has taken a number of steps to address the impact of insulin price increases. We negotiate the best possible discounts off the manufacturers' price on behalf of

---

[105]  Angela Mueller, St. Louis Business Journal (Aug. 31, 2016) https://www.bizjournals.com/stlouis/news/2016/08/31/express-scripts-launches-program-to-control.html (last visited Sept. 6, 2023).

[106]  Angela Mueller, Express Scripts Launches Program to Control Diabetes Costs, St. Louis Bus.J. (Aug. 31, 2016), https://drugstorenews.com/pharmacy/express-scripts-implements-latest- diabetes-care-value-program (last visited July 3, 2023) (emphasis added).

[107]  CVS Caremark 2010 Annual Report, https://s2.q4cdn.com/447711729/files/doc_financials/annual/cvs-ar-2010.pdf.

[108]  CBS News, Diabetes Epidemic Growing (June 22, 2010), https://www.cbsnews.com/news/diabetes-epidemic-growing/ (last visited Sept. 6, 2023).

[109]  Jon Kamp & Peter Loftus, CVS' PBM Business Names Drugs It Plans to Block Next Year, WSJ (Nov. 8, 2012), http://online.wsj.com/article/SB10001424127887324439804578107040729812454.html (last visited Sept. 6, 2023).

employers, unions, government programs, and beneficiaries that we serve."[110]

f. Dr. Sumit Dutta, SVP and Chief Medical Officer of OptumRx, testified before the U.S. Congress in the April 2019 hearing that for "insulin products . . . we negotiate with brand manufacturers to obtain significant discounts off list prices on behalf of our customers."[111]

234. The PBM Defendants have further mislead the public and payors concerning their transparency on pricing negotiations. For example:

a. In 2011, OptumRx's President stated: "We want our clients to fully understand our pricing structure . . . [e]very day we strive to show our commitment to our clients, and one element of that commitment is to be open and honest about our pricing structure."[112]

b. In a 2017 CBS News interview, Express Scripts' CEO represented, among other things, that Express Scripts was "absolutely transparent" about the rebates and other payments they receive from manufacturers and that payors "know exactly how the dollars flow" with respect to these manufacturer payments.[113]

c. When testifying before the Senate Finance Committee, CVS Executive Vice President Derica Rice stated, "[A]s it pertains to transparency overall, we at CVS Caremark are very supportive. We provide full visibility to our clients of all our contracts and the discounts that we

---

[110] Priced Out of a Lifesaving Drug, ¶¶ 714-18.

[111] *Id.* at ¶¶ 904-06.

[112] UnitedHealth Group, *Prescription Solutions by OptumRx Receives 4th Consecutive TIPPS Certification for Pharmacy Benefits Transparency Standards* (Sept. 13, 2011), https://www.businesswire.com/news/home/20110913006224 /en/Prescription-Solutions-OptumRx-Receives-4th-Consecutive-TIPPSSM (last visited July 3, 2023).

[113] CBS News, *Express Scripts CEO Tim Wentworth Defends Role of PBMs in Drug Prices* (Feb 7, 2017), https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/ (last visited Sept. 6, 2023).

negotiate on their behalf . . . And transparency—today we report and fully disclose not only to our clients, but to CMS [Medicare]."[114]

d.    At the same hearing, Steve Miller of Cigna (Express Scripts) testified: "we are really a strong proponent for transparency for those who pay for health care. So the patient should know exactly what they are going to pay. Our plan sponsors need to know exactly what is in their contract."[115]

e.    John Prince of OptumRx likewise stated: "Senator, if our discounts were publicly available, it would hurt our ability to negotiate effectively. Our discounts are transparent to our clients."[116]

235.    However, the PBM Defendants have never revealed the full amount of any drug-specific payments received from the Manufacturer Defendants.

236.    The PBM Defendants do not disclose the terms of the agreements they make with the Manufacturers Defendants. Further, although PBMs negotiate drug-specific rebates with drug manufacturers,[117] the PBM Defendants' rebate payments to payor clients and summaries of such payments are in the aggregate, rather than on a drug-by-drug basis. Thus, it is impossible for payors discern drug- specific rebates. This allowed the PBM Defendants to hide the large payments that they receive for the Analog Insulins.

---

[114] Comm. on Fin. Hearing, Drug Pricing in America: A Prescription for Change, Part III, 28, 32, https://www.finance.senate.gov/imo/media/doc/435631.pdf ("Senate Insulin Report").

[115] *Id.* at 32.

[116] *Id.*

[117] Senate Insulin Report at 40.

237.   In sum, each Defendant concealed that: (i) the list prices for Analog Insulins were fraudulently-inflated, (ii) it was manipulating the list prices of its Analog Insulins, (iii) the list prices bore no relationship to the prices paid for, or the pricing structure of, the Analog Insulins, and (iv) the net prices to the PBM Defendants were either held constant or else decreasing.

238.   The Manufacturer Defendants' publication of their list prices, combined with their concealment of the rebates and net prices, deceived Plaintiff and Class members into believing that the Analog Insulins' list prices were reasonably related to the drugs' net prices.

239.   Plaintiff and Class members relied on Defendants' representations regarding the list prices for Analog Insulins and paid for the Analog Insulins based on these inflated list prices to their detriment. Plaintiff and Class members continue to pay for the Analog Insulins based on their list prices. Such payments are unfair and unconscionable given the value of these drugs as evidence by their true, net prices.

240.   As a result of Defendants' deceptive, unfair, and unconscionable conduct, Plaintiff and Class members overpaid for their Analog Insulins when they paid for these medications based on their list prices. No other entity in the drug supply chain sets these list prices and no other entity in the supply chain has the ability to change these list prices, on which health plan payment—vis-a-vis

pharmacy reimbursements—are directly based. The amount Plaintiff and Class members have overpaid is the difference between the price paid by Plaintiff for the Analog Insulins and a reasonable approximation of the drugs' net prices.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Continuing Violations Doctrine

241.   The conduct of Defendants central to Plaintiff's claims has not ceased; the pricing scheme remains in effect. And all of the relevant conduct of Defendants is part of a continuing unlawful practice. Accordingly, under the continuing violations doctrine, this action is timely because the last act evidencing the continuing practice falls within the applicable limitation periods.

### B.    Fraudulent Concealment Tolling

242.   All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

### C.    Estoppel

243.   Defendants were under a continuous duty to disclose to Plaintiff and Class members the true character, quality, and nature of the list prices upon which their payments for insulin were based.

244.   Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.  CLASS ACTION ALLEGATIONS

245.   Plaintiff brings this action on behalf of itself and all others similarly situated under Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), as representative of a Class defined as follows:

> All entities in the United States of America and its territories which, for purposes other than resale, paid or reimbursed for all or a portion of the purchase price for Apidra, Basaglar, Fiasp, Humalog, Lantus, Levemir, Novolog, Tresiba, and/or Toujeo from 2014 to present at a price calculated by reference to the Average Wholesale Price ("AWP") and/or Wholesale Acquisition Price ("WAC").

246.   Excluded from the Class are: (i) any such entity that owns or is owned by a PBM that performs services for a health plan or plans other than the putative class entity, (ii) any municipal and/or local government fully self-funded prescription drug plan, (iii) the federal and state governments, (iv) fully insured health plans, i.e., plans for which the insurer bears 100% of the risk for the reimbursement obligations to members; (v) PBMs, (vi) natural persons and (vi) Defendants, their subsidiaries and affiliates. For purposes of this class definition, "owns or is owned by" means that at any time during the Class period the entity directly or indirectly owned more than 50% of the outstanding shares of the PBM, or that a PBM directly or indirectly owned more than 50% of the outstanding shares of the entity. By way of clarity and to the extent not excluded above, the Class includes but is not limited to self-insured non-governmental entities, third-party payors that offer insured plans to private individuals and groups, union health and

welfare plans, entities that contract to provide programs for the Federal Employees Health Benefit program, sponsors of plans under Medicare Part D, and Managed Medicaid plan sponsors. Included in the Class are self-insured non-governmental entities and third-party payors that offer insured plans to private individuals and groups. Likewise, third-party payors that offer insured plans to government entities including the Federal Employee Program, Managed Medicaid, and Medicare Part D are Class members.

247.    The Class period is tolled to the earliest date of the' initiation of the pricing scheme described herein, wherein the Manufacturer Defendants artificially inflated the list prices of the Analog Insulins to offer the PBM Defendants higher spreads in exchange for preferred formulary status (the pricing scheme).

248.    Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Hundreds of thousands of prescriptions are written for the Analog Insulins throughout the United States every week, and these prescriptions are reimbursed by health plans all over the country.

249.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct Defendants—i.e., as a result of Defendants' misconduct, these purchasers reimbursed insulin purchases at artificially inflated prices, and they will continue to do so in the future.

250.   Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the other members of the Class.

251.   Counsel that represents Plaintiff are experienced in the prosecution of class action litigation and have particular experience involving pharmaceutical products.

252.   Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making overcharge damages with respect to the Class as a whole appropriate. Such generally-applicable conduct is inherent in Defendants' wrongful conduct.

253.   Questions of law and fact common to the Class include, but are not limited to:

     i.   Whether Defendants engaged in unfair and/or unconscionable conduct;

    ii.   Whether Defendants controlled and inflated the list price (WAC) of the Analog Insulins;

   iii.   Whether Defendants knew that the Class members paid based on the list price (WAC) the Manufacturer Defendants set;

   iv.   Whether Defendants knew that the increased cost of the Analog Insulins harmed the Class members;

    v.   Whether the Class members could reasonably avoid purchase of the Analog Insulins they reimbursed;

vi.    Whether Defendants took advantage of the Class members' lack of capacity to forgo purchases of the Analog Insulins;

vii.    Whether the Manufacturer Defendants competed with one another through rebates to the PBM Defendants, rather than reductions to list prices;

viii.    Whether the Manufacturer Defendants engaged in a pattern and practice of paying illegal kickbacks, disguised as "rebates," to the PBM Defendants that created substantial spreads between the list and net prices;

ix.    Whether the large list-to-net price spreads were intended to induce the PBM Defendants to give the Manufacturer Defendants' Analog Insulins favorable placement on the PBM Defendants' formularies;

x.    Whether the Manufacturer Defendants used artificially inflated list prices as a starting point for negotiating these kickbacks or "rebates" for the Analog Insulins;

xi.    Whether each Defendant conspired for the purpose of carrying out this pricing scheme;

xii.    Whether Plaintiff and Class members made inflated payments based on the artificial list prices for the Analog Insulins;

xiii.    Whether the Manufacturer Defendants copied their competitors' price increases such that all rapid- and long-acting insulins were infected by the pricing scheme;

xiv.    Whether Defendants have lacked honesty regarding the justifications and driving forces behind the list price increases for Analog Insulins;

xv.    Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud or deceive Plaintiff and Class members;

xvi.    Whether Defendants are liable to Plaintiff and Class members for damages, for conduct actionable under the various state consumer protection statutes; and

      xvii.   Whether Defendants are liable to Plaintiff and Class members for damages flowing from their misconduct.

254.   Plaintiff and members of the Class have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly-situated health plans to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. Additionally, Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the Class and require court imposition of uniform relief to ensure compatible standards of conduct toward

the Class, thereby making appropriate equitable relief to the Class as a whole within the meaning of Rule 23(b)(2).

255. Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

256. The Manufacturer Defendants concealed the Analog Insulins' net prices and prevented Plaintiff and Class members from knowing what these prices were to ensure the Manufacturer Defendants would not have to meaningfully lower the net prices of their Analog Insulins. And so that PBMs could and would benefit from the spreads between the net and list prices. Put another way, Manufacturer Defendants' publication of their list prices, while concealing their net prices, is the basis for the *quid pro quo* with the PBM Defendants. Defendants' pricing scheme enabled the Manufacturer Defendants to offer the PBM Defendants large spreads on which to make profits in exchange for preferred formulary status. If the Manufacturer Defendants did not have these spreads to offer, they would have been forced to compete for preferred formulary status through lower list prices. Put simply, without the pricing schemes, the Manufacturer Defendants would have competed for PBM Defendants' business the way competitors do in healthy markets: by lowering the prices. Such competition would have benefited Plaintiff and Class members, who reimburse pharmacies based on AWP, but instead of competing on lower prices, each Manufacturer Defendant competed on a larger spread.

257. To do so, Defendants closely guarded their pricing structures and sales figures for their Analog Insulins. Each Manufacturer Defendant kept secret, the net prices it offered to the PBM Defendants.

258. Each Defendant also concealed its fraudulent conduct by signing confidentiality agreements with those in the supply chain that knew the net prices.

259. In sum, each Defendant concealed that: (i) the list prices for Analog Insulins were fraudulently-inflated, (ii) it was manipulating the list prices of Analog Insulins, (iii) the list prices bore no relationship to the prices paid for, or the pricing structure of, the Analog Insulins, and (iv) the net prices to the PBM Defendants were either held constant or else decreasing.

260. Defendants' publication of the list prices for Analog Insulins, combined with their concealment of their net prices, deceived Plaintiff and Class members into believing that the Analog Insulins' list prices were reasonably related to the drugs' net prices.

261. Plaintiff and the Class relied on the representations regarding their list prices and paid for the Analog Insulins based on these inflated list prices to their detriment. Plaintiff and the Class continue to pay for the Analog Insulins based on their list prices. Such payments are unfair and unconscionable given the value of these drugs as evidence by their true, net prices.

262.   As a result of Defendants' deceptive, unfair, and unconscionable conduct, Plaintiff and Class members overpaid when covering member analog insulin purchases based on their list prices. No other entity in the drug supply chain sets these list prices and no other entity in the supply chain has the ability to change these list prices, on which health plan payments for insulin are directly based. The amount Plaintiff and Class members have overpaid is the difference between the price paid by Plaintiff for the Analog Insulins and a reasonable approximation of the drugs' net prices.

## VIII.  CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)
**(Against All Defendants on behalf of Plaintiff and a Nationwide Class)**

263.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

264.   Plaintiff, on behalf of itself and all others similarly situated, asserts this claim only on behalf of health plans that paid for Analog Insulins purchased directly from the PBM Defendants or their mail-order pharmacies. And Plaintiff, on behalf of itself and all others similarly situated, asserts this claim only to recover for those health plan purchases made from PBM-run mail-order pharmacies. Because Plaintiff, and/or similar health plans, purchased Analog Insulins directly from the

PBM Defendants, via their mail-order pharmacies, they made direct purchases from the RICO enterprises described below.

265.   Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

## A.   Defendants are Culpable "Persons" Under RICO

266.   Plaintiff bring this count against Defendants, as identified below, on behalf of the Class and alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c).

267.   Plaintiff, Class members, and each Defendant are all "persons," as that term is defined in 18 U.S.C. § 1961(3).

## B.   The Manufacturer-PBM Insulin Pricing RICO Enterprises

268.   For purposes of this claim, the RICO "enterprises" are associations-in-fact consisting of (a) *one* of the three largest PBMs—CVS Caremark, Express Scripts, or OptumRx—that administers purchases of the Manufacturer Defendants' Analog Insulins (Eli Lilly's Humalog and Basaglar, Novo Nordisk's Fiasp, Levemir, Novolog, and Tresiba, and Sanofi's Apidra, Lantus, and Toujeo), and (b) *one* of the Manufacturer Defendants, including its directors, employees, and agents. These

associations-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Insulin Pricing Enterprises."

269.  Each of the Manufacturer-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common and/or shared purposes of selling, purchasing, and administering the Analog Insulins to Plaintiff and Class members and deriving secret profits from these activities (the pricing scheme). These profits are greater than either the Manufacturer Defendants or the PBM Defendants could obtain absent their fraudulent concealment of the substantial rebates from the Manufacturer Defendants to the PBM Defendants.

270.  To accomplish this common purpose, Defendants periodically and systematically inflate the list prices of the Analog Insulins. They did so willfully, and with knowledge that Class members make payments directly based on the Manufacturers Defendants' list price. The Manufacturer-PBM Insulin Pricing Enterprises then held out their list prices—to the general public, consumers, and payors, including Plaintiff and Class members—as reasonable representations of the actual cost of these medicines.

271.  It is this scheme that is fraudulent. The Manufacturer Defendants' benchmark prices are no longer a reasonable approximation of the actual price of insulin, and the Manufacturer-PBM Insulin Pricing Enterprises concealed the

magnitude of the spreads between benchmark prices and net prices from Plaintiff and the Class. The Manufacturer-PBM Insulin Pricing Enterprises also concealed from the public the purpose of these spreads: the spreads ultimately result in higher profits for the Manufacturer Defendants, through ensuring formulary access without requiring significant price reductions; and they result in higher profits for the PBM Defendants, whose earnings increase as the spread between list and net prices grows.

272.   Each Manufacturer-PBM Enterprise also shares a common purpose of perpetuating use of insulin list prices as the basis payments in the pharmaceutical industry. With respect to the Manufacturer Defendants, these corporations would not be able to market large spreads to the PBM Defendants in exchange for favorable formulary positions without the use of the inflated list prices as the basis for health care payor payments in the pharmaceutical industry. The PBM Defendants share this common purpose because, without the use of the inflated list prices, their profits on the spread between list and net prices would collapse. As a result, PBM Defendants have, with the knowing and willful participation and assistance of the Manufacturer Defendants, engaged in hidden profit-making schemes falling into two general categories: (i) they keep the difference between what they pay pharmacies for drugs, which is negotiated as a percentage of list price plus dispensing costs, and what insurers pay them, which is a higher percentage of list price plus dispensing costs; (ii) they pocket a percentage of the "spread" between prices.

273.    Each of the Manufacturer-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between each Manufacturer Defendant and each PBM Defendant that is an associate. As to each of the Manufacturer-PBM Insulin Pricing Enterprises, there is a common communication network by which each Manufacturer Defendant and each PBM Defendant share information on a regular basis, including information regarding the Analog Insulin list prices and net prices. As to each of the Manufacturer-PBM Insulin Pricing Enterprises, each Manufacturer Defendant and each PBM Defendant functioned as a continuing unit. At all relevant times, each of the Manufacturer-PBM Insulin Pricing Enterprises was operated by the specific Manufacturer Defendant and PBM Defendant for criminal purposes, namely, carrying out the pricing scheme.

274.    At all relevant times, the PBM Defendants have been aware of the Manufacturer-PBM Insulin Pricing Enterprises' conduct, have been knowing and willing participants in that conduct, and have reaped profits from that conduct. The PBM Defendants strike rebate deals with the Manufacturer Defendants to conceal the true net prices of the Analog Insulins and profit from the inflated list prices. The PBM Defendants have represented to the public that the rebates they negotiate save health care payors (including Plaintiff and Class members) money on prescriptions. But they have known that the increasing spreads did not and do not actually decrease

the net prices of the Analog Insulins: the list prices were and are falsely inflated while the net prices have remained, more or less, constant. But for the Manufacturer-PBM Insulin Pricing Enterprises' common purpose of enlarging the hidden spreads between net and list price, the PBM Defendants would have had the incentive to disclose the fraudulence of the Manufacturer Defendants' list prices. By failing to disclose this information, the PBM Defendants and Manufacturer Defendants perpetuated the conduct of the Manufacturer-PBM Insulin Pricing Enterprises.

275.    Further, the PBM Defendants took instructions and commands from the Manufacturer Defendants regarding use of the Analog Insulin list prices, not only so that they could keep part of the spread, but also so as to continue to earn from the Manufacturer Defendants: (i) *access rebates* for placement of products on their formulary; (ii) *market share rebates* for garnering higher market share than established targets; (iii) *administrative fees* for assembling data to verify market share results; and (iv) *other fees and grants* in an effort to promote products.

276.    In order to garner all of these fees from the Manufacturer Defendants, each PBM Defendant and each Manufacturer Defendant meet on a regular basis to discuss Analog Insulin prices, spreads, marketing opportunities, and coordination of all of the above.

277.    There is a common communication network between each PBM Defendant and each Manufacturer Defendant for the purpose of implementing the

pricing scheme and for the exchange of financial rewards for the PBM Defendants activities that benefit the Manufacturer Defendants.

278.   At all relevant times, each one of the PBM Defendants was aware of the pricing scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.

279.   For purposes of this count, the Manufacturer-PBM Insulin Pricing Enterprises are further identified as follows:

### 1.      The Eli Lilly-PBM Enterprises

280.   The Eli Lilly-PBM Enterprises are three separate associations-in-fact consisting of each of the PBM Defendants that administers purchases of Eli Lilly's Humalog and Basaglar, including its directors, employees, and agents, and Eli Lilly, including its directors, employees and agents: (1) the Eli Lilly-CVS Caremark association-in-fact enterprise; (2) the Eli Lilly-Express Scripts association-in-fact enterprise; and (3) the Eli Lilly-OptumRx association-in-fact enterprise. Each of the Eli Lilly-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Eli Lilly's rapid-acting analog insulin product, Humalog, and it's long-acting analog insulin product, Basaglar, as treatments for type 1and 2 diabetes to the exclusion of competitor products. Each of the Eli Lilly-PBM

Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Eli Lilly and CVS Caremark, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx. As to each of these Eli Lilly-PBM Enterprises, there is a common communication network by which Eli Lilly and CVS Caremark, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx share information on a regular basis. As to each of these Eli Lilly-PBM Enterprises, Eli Lilly and CVS Caremark, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx function as continuing but separate units. At all relevant times, each of the Eli Lilly-PBM Enterprises was operated and conducted by Eli Lilly and the specific PBM Defendant for criminal purposes, namely, carrying out the pricing scheme.

### 2. The Novo Nordisk-PBM Insulin Pricing Enterprises

281. The Novo Nordisk-PBM Insulin Pricing Enterprises are three separate associations-in-fact consisting of each of the PBMs that administered purchases of Novo Nordisk's Fiasp, Novolog, Levemir, and Tresiba including its directors, employees, and agents, and Novo Nordisk, including its directors, employees and agents: (1) the Novo Nordisk-CVS Caremark association-in-fact enterprise; (2) the Novo Nordisk-Express Scripts association-in-fact enterprise; and (3) the Novo Nordisk-OptumRx association-in-fact enterprise. Each of the Novo Nordisk-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization

consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Novo Nordisk's long-acting analog insulin products, Levemir and Tresiba, and its rapid-acting analog insulin products, Fiasp and Novolog, as treatments for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Novo Nordisk-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Novo Nordisk and CVS Caremark, Novo Nordisk and Express Scripts, and Novo Nordisk and OptumRx. As to each of these Novo Nordisk-PBM Insulin Pricing Enterprises, there is a common communication network by which Novo Nordisk and CVS Caremark, Novo Nordisk and Express Scripts, and Novo Nordisk and OptumRx share information on a regular basis. As to each of these Novo Nordisk-PBM Insulin Pricing Enterprises, Novo Nordisk and CVS Caremark, Novo Nordisk and Express Scripts, and Novo Nordisk and OptumRx function as continuing but separate units. At all relevant times, each of the Novo Nordisk-PBM Insulin Pricing Enterprises was operated and conducted by Novo Nordisk and the specific PBM Defendant for criminal purposes, namely, carrying out the pricing scheme.

### 3.    The Sanofi-PBM Insulin Pricing Enterprises

282.  The Sanofi-PBM Insulin Pricing Enterprises are three separate associations-in-fact consisting of each of the PBMs that administered purchases of Sanofi's Apidra, Lantus, and Toujeo, including its directors, employees, and agents, and Sanofi, including its directors, employees and agents: (1) the Sanofi-CVS Caremark association-in-fact enterprise; (2) the Sanofi-Express Scripts association-in-fact enterprise; and (3) the Sanofi-OptumRx association-in-fact enterprise. Each of the Sanofi-PBM Insulin Pricing Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Sanofi's long-acting analog insulin products, Lantus and Toujeo, and its rapid-acting analog insulin product, Apidra, as treatments for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Sanofi-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Sanofi and CVS Caremark, Sanofi and Express Scripts, and Sanofi and OptumRx. As to each of these Sanofi-PBM Insulin Pricing Enterprises, there is a common communication network by which Sanofi and CVS Caremark, Sanofi and Express Scripts, and Sanofi and OptumRx share information on a regular basis. As to each of these Sanofi-PBM Insulin Pricing Enterprises, Sanofi and CVS Caremark, Sanofi

and Express Scripts, and Sanofi and OptumRx function as continuing but separate units. At all relevant times, each of the Sanofi-PBM Insulin Pricing Enterprises was operated and conducted by Sanofi and the specific PBM Defendant for criminal purposes, namely, carrying out the pricing scheme.

283.   The Manufacturer-PBM Insulin Pricing Enterprises (Eli Lilly-CVS Caremark, Eli Lilly-Express Scripts, Eli Lilly-OptumRx, Novo Nordisk-CVS Caremark, Novo Nordisk-Express Scripts, Novo-Nordisk- OptumRx, Sanofi-CVS Caremark, Sanofi-Express Scripts, and Sanofi-OptumRx) knowingly made material misrepresentations to Class members in furtherance of the fraudulent scheme regarding:

a.   The net prices of the Analog Insulins;[118]

b.   The extent to which the net prices of the Analog Insulins departed from their artificially-inflated list prices;

c.   That the Analog Insulins' list prices served as a reasonable and fair basis for health plan payments for Analog Insulins purchased by health plan participants at mail-order pharmacies;

d.   The extent to which the Manufacturer Defendants and the PBM Defendants negotiated the rebates discounting the list prices of the Analog Insulins in good faith and for a proper purpose;

e.   Whether the rebates—as opposed to lower list prices—saved health plans and the general public money;

---

[118] The Eli Lilly-PBM Enterprises made these misrepresentations with respect to Humalog and Basaglar. The Novo Nordisk-PBM Insulin Pricing Enterprises made these representations with respect to Fiasp, Novolog, Levemir, and Tresiba. The Sanofi-PBM Enterprises made these misrepresentations with respect to Apidra, Lantus, and Toujeo. All references to "Analog Insulins" refer to the specific insulins relevant to each manufacturer PBM enterprise.

f.  Whether the "preferred" formulary status of the Analog Insulins reflects the drugs' safety, efficacy, or cost-effectiveness, as determined by the PBM Defendants' formulary committees;

g.  Whether the Analog Insulins would have been placed in "preferred" formulary positions absent the spreads; and

h.  The extent to which the pricing schemes forced Plaintiff and Class members to incur additional expenses for their Analog Insulin prescriptions.

284.  The Manufacturer Defendants alone could not have accomplished the purposes of the Manufacturer-PBM Insulin Pricing Enterprises without the assistance of the PBM Defendants. For the Manufacturer Defendants to profit from the scheme, the PBM Defendants needed to convince health plans, like Plaintiff, to select their formularies, on which varying Analog Insulins were given favorable treatment. And the PBM Defendants did so by telling health plans (including Plaintiff), potential clients, and investors that they secured lower prices. The lower prices were illusory, the result of a deliberate scheme to create large spreads without lowering net prices. Without these misrepresentations, the Manufacturer-PBM Enterprise could not have achieved its common purpose.

285.  The impacts of the Manufacturer-PBM Insulin Pricing Enterprises are still in place, i.e., the increased spreads between the benchmark and net prices of the Analog Insulins are still being maintained.

286.  The foregoing evidences that the Manufacturer Defendants and PBM Defendants were each willing participants in the Manufacturer-PBM Insulin Pricing

Enterprises, had a common fraudulent purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprises' purposes, i.e., to increase profits for both the Manufacturer Defendants and the PBM Defendants through kickbacks to the PBM Defendants and continued formulary status without net price reductions for the Manufacturer Defendants.

### C. The Manufacturer-PBM Insulin Pricing RICO Enterprises' of the U.S. Mails and Interstate Wire Facilities

287. Each of the Manufacturer-PBM Insulin Pricing Enterprises engaged in and affected interstate commerce because they engage in the following activities across state boundaries: the sale, purchase and/or administration of the Analog Insulins; the setting of the prices of the Analog Insulins; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission to patients of individual prescriptions for the Analog Insulins by mail-order pharmacies; and/or the transmission and/or receipt of invoices, statements, and payments related to the use or administration of the Analog Insulins. During the Class period, the Manufacturer-PBM Insulin Pricing Enterprises participated in the administration of the Analog Insulins to millions of individuals located throughout the United States.

288. During the Class period, Defendants' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and

information and products and funds through the U.S. mails and interstate wire facilities.

289.  The nature and pervasiveness of Defendants' pricing scheme, which was orchestrated out of the corporate headquarters of Defendants, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities between Manufacturer Defendants and PBM Defendants.

290.  Most of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these defendants' books and records. Indeed, an essential part of the successful operation of the pricing scheme alleged herein depended upon secrecy, and as alleged above. And Defendants took deliberate steps to conceal their wrongdoing. However, Plaintiff can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the pricing scheme.

291.  Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the pricing scheme involved thousands of communications throughout the Class period including, *inter alia*:

    a.    Marketing materials about the list prices for the Analog Insulins and the available spreads, which Manufacturer Defendants sent

to PBM Defendants located across the country;

b.    Written and oral representations of the Analog Insulin list prices that the Manufacturer Defendants made at least annually and, in many cases, several times during a single year;

c.    Thousands of written and oral communications discussing, negotiating, and confirming the placement of a Manufacturer Defendant's Analog Insulins on a particular PBM Defendant's formulary;

d.    Written and oral representations regarding information or incentives designed to lessen the prices that each of the PBM Defendants paid for the Analog Insulins, and/or to conceal those prices or the pricing scheme;

e.    Written communications, including checks, relating to rebates, kickbacks, or other financial inducements paid to each of the PBM Defendants to persuade them to advocate one Manufacturer Defendants' Analog Insulin over a competitor's product;

f.    Written and oral communications with U.S. government agencies and private insurers that fraudulently misrepresented what the list prices were, or that were intended to deter investigations into the true nature of the list prices or to forestall changes to reimbursement based on something other than list prices;

g.    Written and oral communications with health insurers and patients;

h.    Transmission of list prices from manufacturers to third parties;

i.    Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities—the wrongful proceeds of Defendants' pricing scheme.

j.    In addition to the above-referenced RICO predicate acts, Defendants' corporate headquarters have communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the pricing scheme. These mails include some of the documents referenced in this Complaint.

### D.    Conduct of the RICO Enterprises' Affairs

292.    During the Class period, each of the Manufacturer Defendants has exerted control over the Manufacturer-PBM Insulin Pricing Enterprises with which they were associated and, in violation of Section 1962(c) of RICO, each of the Manufacturer Defendants have conducted or participated in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly. Such participation was carried out in the following ways:

a.    Each of the Manufacturer Defendants has directly controlled the list and net prices for its Analog Insulins, which determines the amount of each of the PBMs' compensation;

b.    Each of the Manufacturer Defendants has directly controlled the lists prices that it publicly reports;

c.    Each of the Manufacturer Defendants has directly controlled the creation and distribution of marketing, sales, and other materials used to inform each of the PBM Defendants of the profit potential of its Analog Insulins;

d.    Each of the Manufacturer Defendants has relied upon its employees and agents to promote the pricing scheme through the U.S. mails, through interstate wire facilities, and through direct contacts with providers and the PBM Defendants; and

e.    Each of the Manufacturer Defendants has controlled and participated in the affairs of the Manufacturer-PBM Insulin Pricing Enterprises with which it is associated by providing rebates (as detailed above) or other inducements to place that Manufacturer Defendant's Analog Insulin(s) on a PBM Defendant's formulary or advocate the use of a certain Analog Insulins. These inducements include the Manufacturer Defendants' payment to PBM Defendants of: (i) access rebates for placement of products on the PBM Defendants' formulary; (ii) market share rebates for garnering higher market share than established targets; (iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants.

Although PBM Defendants typically agree to share rebates in some form with clients, they usually refuse to disclose specific rebate amounts to health plans, such as Plaintiff. Instead, the PBMs typically disclose rebates in an aggregate compared to performance standards, thereby preventing the health plan, including Plaintiff, from learning the true number of rebates that the PBM Defendant has received in connection with the Analog Insulins. Such a lack of transparency obfuscates the delta between the Manufacturer Defendants' list prices and their net prices so that the health plans, including Plaintiff, have no way to ascertain whether the prices they are paying for the Analog Insulins are fair and competitive.

f.    The Manufacturer Defendants intended that the PBM Defendants would (and did) distribute, through the U.S. mail and interstate wire facilities, promotional and other materials which claimed that rebates saved health care payors, like Plaintiff and Class members, money on prescriptions need; and

g.    The Manufacturer Defendants represented to the general public, by stating the Analog Insulins' list prices without stating that these list prices differed substantially from those net prices offered to the PBM Defendants, that the Analog Insulins' list prices reflected or approximated true prices for those drugs.

293.   Each of the Manufacturer-PBM Insulin Pricing Enterprises identified above had a hierarchical decision-making structure headed by the respective Manufacturer Defendant.

294.   In violation of Section 1962(c) of RICO, each of the Manufacturer Defendants has conducted and/or participated in the affairs of each of the Manufacturer-PBM Insulin Pricing Enterprises with which they associated by reporting fraudulently inflated list prices for the Analog Insulins and by misrepresenting to Plaintiff and Class members through the publication of their list prices that these list prices were reasonable bases for Plaintiff and Class member

out-of-pocket payments, thereby inducing Plaintiff and Class members to pay inflated amounts for the Analog Insulins.

### E.    Defendants' Pattern of Racketeering Activity

295.    Each of the Defendants has conducted and participated in the affairs of their respective Manufacturer-PBM Insulin Pricing Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. Defendants' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their pricing schemes. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which Defendants intended to defraud Plaintiff, Class members, and other intended victims of the pricing scheme.

296.    Each Defendant's fraudulent and unlawful pricing scheme consisted, in part, of deliberately overstating the list prices for its Analog Insulins, thereby creating a spread between net and list prices. Each Manufacturer Defendant then used those spreads to induce each of the PBM Defendants to advocate and favor that Manufacturer Defendant's drugs.

297.   The pricing scheme was calculated and crafted such that Plaintiff and Class members would pay for the Analog Insulins based on the artificially inflated, list prices. In designing and implementing the pricing scheme, Defendants were cognizant, at all times, of the fact those Plaintiff and Class members were not part of the enterprise and relied upon the integrity of Defendants in setting the list prices.

298.   By intentionally and artificially inflating the list prices, and by subsequently failing to disclose such practices to Plaintiff and Class members, each of the Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

299.   Defendants' racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive Plaintiff and Class members. Each separate use of the U.S. mails and/or interstate wire facilities employed by each of the Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff and Class members. Each of the Defendants has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Insulin Pricing Enterprises with which each of them is and was associated in fact.

300.   Defendants' conduct is also unfair, deceptive, and unlawful because it violates the Federal Anti-Kickback statutes.

301.    The Anti-Kickback Statute prohibits knowing and willful solicitation, receipt, offer, or payment of remuneration to induce the purchase of any item or service for which payment may be made in whole or in part under a federal health care program. 42 U.S.C. § 1320a-7b(b). Pharmaceutical manufacturers may be liable under the anti-kickback statute if they offer to induce the purchase of drugs paid for by Medicare Part D or any other Federal health care program. "Federal health care program" is defined in the anti-kickback statute as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under Chapter 89 of Title 5); or (2) any State health care program, as defined in section § 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(f).

302.    The purported "discounts" or "rebates" afforded by the PBM Defendants to the Manufacturer Defendants do not fall within the (h) safe harbor. First, they are neither "discounts" nor "rebates" alone, as they are accompanied by the quid pro quo of getting preferred formulary treatment. Second, the "discounts" or "rebates" do not reduce the manufacturer's net selling price—to the extent that the manufacturer has increased the benchmark price to make up for an increased "rebate," all that it has done is created a widened spread from which the PBM Defendants can make more money. This is a classic kickback.

### F.    Defendants' Motive

303.    Defendants' motive in creating and operating the pricing scheme and conducting the affairs of the Manufacturer-PBM Insulin Pricing Enterprises described herein was to fraudulently obtain sales of and profits Analog Insulins.

304.    The pricing scheme was designed to, and did, encourage others, including health care providers, to advocate the use of the Manufacturer Defendants' Analog Insulins. Thus, each of the Manufacturer Defendants used the pricing scheme to sell more of its drugs, thereby fraudulently gaining sales, marketplace share, and profits.

305.    The PBM Defendants used the pricing scheme to increase their profits by benefitting from larger spreads between the list prices and net prices of the Analog Insulins.

### G.    Damages Caused by Defendants' Pricing Scheme

306.    Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiff and Class members to be injured in their business or property. Plaintiff and Class members have overpaid many hundreds of millions of dollars based on Defendants' deceptive list prices for their Analog Insulins. Each Defendant intended and foresaw that Plaintiff and Class members would make such payments tied directly to Defendants' list prices.

307. The Manufacturer Defendants sent billing statements through the U.S. mails or by interstate wire facilities and reported the list prices and other information by the same methods in furtherance of their pricing scheme. Plaintiff and Class members have made inflated payments for the Analog Insulins based on and/or in reliance on reported and false list prices. As previously explained, when a patient fills a prescription for one of the Analog Insulins at CVS, Express Scripts, or OptumRx mail-order pharmacy, her health plan is responsible for a portion or nearly all of the medication's cost. And the health plans pay directly to CVS, Express Scripts, or Optum Rx, members of the Manufacturer-PBM Insulin Pricing Enterprises.

308. The amount of each of payment for Analog Insulin is tied directly to the Manufacturer Defendants' list prices. No other intermediary in the supply chain has control over or is responsible for the list prices on which consumer payments are based. By setting the list prices of the Analog Insulins, Defendants are setting the prices Plaintiff and Class members must pay. Therefore, when each Manufacturer Defendant artificially inflates each analog insulin's list price and then uses each Manufacturer-PBM Insulin Pricing Enterprises to sell those Analog Insulins, they also artificially inflate Plaintiff's and Class members' payments for those drugs.

309.  Plaintiff's and Class members' damages are therefore the difference between the Manufacturer Defendants' reported benchmark prices and the net prices at which they sell their Analog Insulins.

310.  As previously explained, Plaintiff, like the Class members, receives and received rebates from its PBM on a lump sum basis across all drugs it purchases from a given pharmaceutical company (it does not receive individual rebates on specific drugs). Consequently, Plaintiff and Class members have no way of ascertaining the true net pries of the Analog Insulins. This lack of transparency results in two harms.

311.  First, the lack of transparency obfuscates the difference between the Manufacturer Defendants' list and net prices such that the health plans, including Plaintiff, cannot ascertain whether the prices they pay for the Analog Insulins are fair and competitive.

312.  Second, this opaque dual pricing system has misled the plans into believing they are receiving a better deal on the Analog Insulins than they are actually receiving. Defendants have told health plans, like Plaintiff, that they are benefitting from a system of high list prices and rebates—that the health plans are obtaining lower prices for the Analog Insulins than they would absent the rebates. This narrative is wrong. If Defendants were required to publish a list price that approximated their true net prices, Defendants would have to start competing

through significantly lower *net* prices, rather than significantly inflated *list* prices. Despite selling interchangeable products, Defendants have managed to escape the usual consequence of competition: lower prices. Their list price manipulation has enabled them to keep the net prices for the Analog Insulins the same for decades, despite stiff competition. Clear, transparent pricing would force Defendants to compete on, and therefore lower, net price, benefiting both Plaintiff and consumers.

313.   Plaintiff' injuries, and those of the Class members, were proximately caused by Defendants' racketeering activity. But for the misrepresentations that Defendants made regarding the list prices of their Analog Insulins and the scheme that the Manufacturer-PBM Insulin Pricing Enterprises employed, Plaintiff and Class members would have paid less for Analog Insulins.

314.   Defendants' racketeering activity directly and proximately caused Plaintiff's injuries.

315.   By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, Defendants are jointly and severally liable to Plaintiff and Class members for three times the damages that Plaintiff and Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

316.   By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, Plaintiff and Class members further seek

injunctive relief against Defendants for their fraudulent reporting of their AWPs, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. Plaintiff will continue purchasing the Manufacturer Defendants' Analog Insulin medications, and Plaintiff and Class members will continue to pay based on Defendants' fraudulent benchmark prices. In a country where tens of thousands of citizens cannot afford their Analog Insulins, or where the expense of such drugs is a great burden on millions, and there is no cure for diabetes, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiff will seek injunctive relief, including an injunction against Defendants, to prevent them from reporting benchmark prices that do not approximate their true net prices.

## COUNT TWO
## BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C)
### (Against All Defendants on behalf of Plaintiff and a Nationwide Class)

317.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

318.   Defendants have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c)

Manufacturer-PBM Insulin Pricing Enterprises described previously through a pattern of racketeering activity.

319.  As set forth in detail above, the Manufacturer Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, Defendants inflated the stated list prices of the Analog Insulins to achieve an unlawful purpose; made false or misleading statements or material omissions regarding the net prices of their Analog Insulins; and made false or misleading statements or material omissions regarding the existence and amount of their Analog Insulins' list-to-net price spread. The truth about the net prices of the Analog Insulins as distinguished from the inflated list prices would be material to a reasonable consumer or health plan.

320.  From the outset, Defendants knew, but did not disclose, that the list prices selected and published for the Analog Insulins did not reflect the net prices of those products. Defendants knew that the list prices they selected were not reasonable approximations of the true market prices of the Analog Insulins. Yet they held out these list prices as reasonable approximations of the true costs of the Analog Insulins and reasonable bases for purchase their Analog Insulins directly from the Manufacturer Defendants.

321.  The Manufacturer Defendants substantially inflated the list prices of their Analog Insulins so they could offer larger spreads to the PBM Defendants in

exchange for favorable formulary positions. Defendants knew, but did not disclose, that the list-to-net price spreads did not reduce the prices paid by Plaintiff and Class members who purchased their Analog Insulins based on list price. Defendants knowingly and deliberately misled health plans regarding the pricing of the Analog Insulins.

322.   The nature of the above-described Defendants' co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

323.   Defendants have and continue to engage in the commission of overt acts, including the following unlawful racketeering predicate acts:

a.    Multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

b.    Multiple instances of wire fraud in violations of 18 U.S.C. § 1343;

c.    Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952; and

d.    Multiple instances of bribery in violation of state statutes, including but not limited to N.J. Stat. Ann. § 2C:21-10(a).

324.   Defendants' violations of the above federal and state laws and the effects thereof detailed above are continuing and will continue. Plaintiff and Class members have been injured in their property by reason of these violations: Plaintiff

and Class members have made billions of dollars in payments for the Analog Insulins that they would not have made but for Defendants' conspiracy to violate 18 U.S.C. § 1962(c).

325.  Defendants' racketeering activity directly and proximately injured Plaintiff and Class members: Plaintiff and Class members substantially overpaid for Analog Insulins when they paid for these medicines based on the Manufacturer Defendants' list prices.

326.  By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiff and Class members for three times the damages Plaintiff and Class members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

327.  By virtue of these violations of 18 U.S.C. § 1962(d), under the provisions of Section 1964(d) of RICO, Plaintiff and Class members further seek injunctive relief against Defendants for their fraudulent reporting of list prices, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. Plaintiff and Class members will continue purchasing the Manufacturer Defendants' Analog Insulin medications, and Plaintiff and Class members will continue to pay based on Defendants' fraudulent list prices. In a country where tens of thousands of citizens cannot afford their Analog Insulins, or where the expense

of such drugs is a great burden on millions, and there is no cure for diabetes, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiff will seek injunctive relief, including an injunction against Defendants to prevent them from reporting list prices that do not approximate their true net prices.

**COUNT THREE**
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT**
**("NJCFA")**
**N.J. STAT. ANN. § 56:8-1, *et seq.***
**(Against Novo Nordisk and Sanofi on behalf of a Nationwide Class)**

328.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

329.   Novo Nordisk is a corporation with its headquarters in Plainsboro, New Jersey. Sanofi is a corporation with its headquarters in Bridgewater, New Jersey. New Jersey "has a powerful incentive to ensure that local merchants deal fairly with citizens of other states and countries"[119] and a "strong interest 'in regulating its domestic businesses and in deterring fraudulent business practices.'"[120]

---

[119] *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998); *see generally Weinberg v. Sprint Corp.*, 173 N.J. 233, 249 (2002) (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

[120] *Kalow & Springut LLP v. Commence Corp.*, 2012 WL 6093876, at *4 (D.N.J. Dec. 7, 2012) (quoting *DalPonte v. Am. Mortg. Express Corp.*, 2006 WL 2403982 (D.N.J. Aug. 16, 2006)).

Furthermore, New Jersey has some of the "strongest consumer protection laws in the nation."[121] Therefore, although other states may have some interest in protecting their own consumers, that interest is not frustrated by the application of New Jersey's law. "If a strong state policy or interest will [not be] frustrated by the failure to apply [that state's law], it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law."[122]

330.    Plaintiff seeks in this Count, a nationwide class applying New Jersey law to the claims against Novo Nordisk and Sanofi.

331.    In addition to prohibiting fraudulent and deceptive conduct, the NJCFA prohibits unfair or unconscionable conduct.

332.    Unconscionability "is an amorphous concept obviously designed to establish a broad business ethic. The standard of conduct that the term 'unconscionable' implies is a lack of good faith, honesty in fact and observance of fair dealing."[123] Unconscionable practices include performance of an agreement, in

---

[121] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15 (1994).

[122] *Fu v. Fu*, 160 N.J. 108, 122-23 (1999); *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the NJCFA).

[123] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994) (quoting *Kugler v. Romain*, 58 N.J. 522, 543-44 (1971)).

addition to inducing a purchase.[124] Charging a price far in excess of the seller's costs, combined with taking advantage of an unfair situation, is an unconscionable practice contrary to the NJCFA.[125]

333. As the Third Circuit recently recognized, "unfair" and "unconscionable" business practices are "a category of business practices entirely separate from practices that are fraudulent, deceptive, or misleading" prohibited under the NJCFA.[126] The NJCFA "prohibit[s] business practices that are 'unfair' or 'unconscionable' in addition to practices that are fraudulent, deceptive, or misleading; these terms are defined separately and differently in the text of the statutes and in relevant case law interpreting them."[127]

334. As is set forth above, the prices Plaintiff and Class members reimburse for Analog Insulins, based on their list prices, have been skyrocketing. This overpayment is a result of Novo Nordisk's and Sanofi's spread scheme, wherein

---

[124] *Pollitt v. DRS Towing LLC*, No. 10-1285 (AET), 2011 WL 1466378, at *7 (D.N.J. April 18, 2011) (citing *New Mea Constr. Corp. v. Harper*, 203 N.J. Super. 486, 501 (App. Div. 1985)).

[125] *Kugler v. Romain*, 58 N.J. 522, 542-45 (1971); *In re Nat'l Credit Mgt. Grp., LLC*, 21 F. Supp. 2d 424, 452-53 (D.N.J. 1998); *In re Fleet*, 95 B.R. 319, 336 (E.D. Pa. 1989); *Pro v. Hertz Equip. Rental*, 2012 WL 12906183 (D.N.J. June 25, 2012).

[126] *Cottrell v. Alcon Labs.*, 874 F.3d 154, 165 (3d Cir. 2017).

[127] *Id.* (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (explaining that an unconscionable practice can qualify as unlawful under the NJCFA, "even if no person was in fact misled or deceived thereby")).

they sell larger list prices, and therefore spreads, to the PBM Defendants in exchange for preferred formulary positions.

335. The Analog Insulins sold by Novo Nordisk and Sanofi have not changed since they entered the marketplace in the 1990s and 2000s. These Analog Insulins are no more effective and provide no more benefit than they did decades ago. Nonetheless, Novo Nordisk and Sanofi have exponentially increased their list prices.

336. There is no economic or technological reason why Analog Insulins would have become more expensive to produce during the period outlined above. Indeed, with technological advances and economies of scale, the per-unit cost of Analog Insulin should have gone down during the same period that Novo Nordisk and Sanofi were drastically raising prices.

337. Novo Nordisk and Sanofi were able to raise the list prices of insulin because health plans who cover patients living with diabetes literally have no choice but to purchase the prescribed Analog Insulins. If they do not, plan members will die, and Novo Nordisk and Sanofi know it. Even cutting back on analog insulins to save money, as is described above, can lead to serious health consequences.

338. These actions are made even more unfair and unconscionable by the fact that the rate of diabetes is rising in the United States, giving Novo Nordisk, Sanofi, and PBMs more people off whom they can take advantage. Moreover, Novo

Nordisk and Sanofi know that the other has not and will not compete based on real reductions in net price; each prefers to compete on inflation of list prices. Even in the absence of collusion, it is in each of Novo Nordisk's and Sanofi's individual best interest not to compete on net price reductions because doing so would lead to a price war which would upset the unconscionable profits earned by all three.

339.   Plaintiff, on behalf of the Class, therefore alleges that Novo Nordisk and Sanofi, in violation of N.J. Stat. Ann. § 56:8-2, have engaged in an unconscionable commercial practice in connection with their sale and pricing of the Analog Insulins.

340.   Plaintiff and other Class members have suffered ascertainable losses as a result of Novo Nordisk and Sanofi's unfair and unconscionable act complained of herein. Under N.J. Stat. Ann. § 56:8-19, they are entitled to relief in the amount of Novo Nordisk's and Sanofi's overcharges: the difference between the list prices for their Analog Insulins and a reasonable approximation of their net prices. Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act."[128] Furthermore, "In any action under

---

[128] N.J. Stat. Ann. § 56:8-19.

this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, . . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."[129] Therefore, Plaintiff is entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

## COUNT FOUR
## VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
## ("ARIZONA CFA")
## ARIZ. REV. STAT. § 44-1521, *et seq.*
## (Against All Defendants)

341.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

342.   The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether

---

[129] *Id.*

or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."[130]

343.   Defendants, Plaintiff, and Class members are "persons" within the meaning of Ariz. Rev. Stat. § 44-1521(6).

344.   Each Analog Insulin is "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

345.   Defendants' conduct, as set forth above, occurred in the conduct of trade or commerce.

346.   As alleged in this Complaint, Defendants have employed "deception," "fraud, false pretense, false promise, misrepresentation, [and/]or concealment"[131] with respect to their Analog Insulins.

347.   Defendants' conduct, as described in this Complaint, also constitutes "unfair act[s]."[132]

348.   Pursuant to the Arizona CFA, Plaintiff seeks monetary relief against each Defendant in an amount to be determined at trial. Plaintiff also seeks punitive damages because Defendants have engaged in conduct that is wanton, reckless, or

---

[130] Ariz. Rev. Stat. § 44-1522(A).

[131] *Id.*

[132] *Id.*

shows spite or ill-will,[133] and/or acted with reckless indifference to the interests of others.[134]

349.   Plaintiff also seeks an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT FIVE
## VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT ("ARKANSAS DTPA")
## ARK. CODE § 4-88-101, *et seq.*
## (Against All Defendants)

350.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

351.   The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices,"[135] which include, but are not limited to, "[e]ngaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade."[136] The Arkansas DTPA also prohibits "[k]nowingly taking advantage of a consumer who is reasonably unable to protect his or her interest because of: (A)

---

[133] *See Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 577 (1974); *Lufty v. R. D. Roper & Sons Motor Co.*, 57 Ariz. 495, 115 P.2d 161 (1941).

[134] *See Sellinger*, 110 Ariz. at 577; *McNelis v. Bruce*, 90 Ariz. 261 (1961).

[135] Ark. Code. § 4-88-107(a).

[136] *Id.* § 4-88-107(a)(10).

Physical infirmity; (B) Ignorance; . . . or (E) A similar factor."[137] The statute further bars, in connection with the sale or advertisement of any goods, "(1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission."[138]

352.   Defendants, Plaintiff, and Class members are "persons" within the meaning of Ark. Code § 4-88-102(5).

353.   Each Analog Insulin constitutes "goods" within the meaning of Ark. Code § 4-88102(4).

354.   As alleged in this Complaint, Defendants' conduct with respect to the Analog Insulins constitutes both "unconscionable" and "deceptive" acts in violation of the Arkansas DTPA.

355.   Plaintiff seeks monetary relief against Defendants in an amount to be determined at trial. Plaintiff also seeks punitive damages because Defendants acted wantonly in causing Plaintiff's and Class members' injuries or with such a conscious indifference to the consequences that malice may be inferred.

---

[137] *Id.* § 4-88-107(a)(8).

[138] *Id.* § 4-88-108.

356.   Plaintiff also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

**COUNT SIX**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**("UCL")**
**CAL. BUS. & PROF. CODE § 17200, *et seq.***
**(Against All Defendants)**

357.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

358.   The UCL prohibits "unlawful, unfair, or fraudulent business acts or practices."

359.   Defendants violated the "unlawful" prong of § 17200 through their pricing scheme for the Analog Insulins, as described throughout this Complaint.

360.   Defendants also violated the "fraudulent" prong of § 17200 through their pricing fraud, as described throughout this Complaint.

361.   In addition, Defendants violated the "unfair" prong of § 17200[139] because Defendants' acts and practices described in this Complaint, including the Manufacturer Defendants' artificial inflation of list prices to offer large rebates to

---

[139] *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) ("A business act or practice may violate the [UCL] if it is either unlawful, unfair, or fraudulent. Each of these three adjectives captures a separate and distinct theory of liability.") (internal quotation marks and citation omitted).

the PBM Defendants, caused Defendants to profit at the expense of Plaintiff and Class members.

362.   The California courts have set out several definitions of unfairness. Defendants' conduct is unfair under each of them:

a.      "[T]he consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided."[140]

b.      Defendants' conduct "offends an established public policy [the FTC Policy Statement on Unfairness] or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[141]

c.      Plaintiff's claim is predicated upon public policy which is "'tethered' to specific constitutional, statutory or regulatory provisions."[142]

363.   Defendants' actions, as set forth above, occurred within the conduct of their business and in trade or commerce.

---

[140] *See Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 839 (2006).

[141] *See West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 806 (2013) (quoting *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001)).

[142] *See West*, 214 Cal. App. at 806 (quoting *Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003)).

364.   Pursuant to Cal. Bus. & Prof. Code § 17203, the Court may "restore to any person in interest any money or property, real or personal, which may have been acquired by means of" a violation of the statute.

365.   Plaintiff requests that this Court enter such orders or judgments as may be necessary, including: a declaratory judgment that each Defendant has violated the UCL; an order enjoining Defendants from continuing their unfair, unlawful, and/or fraudulent trade practices; an order restoring to Plaintiff any money lost as result of each Defendant's unfair, unlawful, and/or fraudulent trade practices, including restitution and disgorgement of any profits Defendants received as a result of their unfair, unlawful, or fraudulent practices, as provided in Cal. Bus. & Prof. Code § 17203, Cal. Civ. Proc. Code § 384, and Cal. Civ. Code § 3345; and for any other relief as may be just and proper.

366.   In addition, under Cal. Civ. Proc. Code § 1021.5, the Court "may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

## COUNT SEVEN
## VIOLATION OF THE COLORADO CONSUMER PROTECTION ("COLORADO CPA")
## COLO. REV. STAT. § 6-1-101, *et seq.*
## (Against All Defendants)

367. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

368. The Colorado CPA prohibits deceptive practices in the course of a person's business including, but not limited to: "Advertis[ing] goods, services, or property with intent not to sell them as advertised"; "Mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions"; and "Fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."[143]

369. Each Defendant is a "person" under Colo. Rev. Stat. § 6-1-102(6).

370. Plaintiff and Class members are "consumers" for purposes of Colo. Rev. Stat. § 6-1-113(1)(a).

371. Each Defendant's conduct, as set forth above, occurred in the conduct or trade or commerce.

---

[143] Colo. Rev. Stat. § 6-1-105(1).

372.    As alleged in this Complaint, Defendants' conduct with respect to the Analog Insulins constitutes: "Advertis[ing] goods, services, or property with intent not to sell them as advertised"; "Mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions"; and "Fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction"[144] in violation of the Colorado CPA.

373.    Under Colo. Rev. Stat. § 6-1-113, Plaintiff seeks monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages and (b) statutory damages in the amount of $500 for each Plaintiff or Class member.

374.    Plaintiff also seeks an order enjoining each Defendant's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

---

[144] *Id.*

## COUNT EIGHT
## VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CONNECTICUT UTPA") CONN. GEN. STAT. § 42-110A, *et seq.* (Against All Defendants)

375.  Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

376.  The Connecticut UTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[145]

377.  Each Defendant is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

378.  Defendants' challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

379.  As alleged in this Complaint, Defendants' conduct with respect to the Analog Insulins constitutes both "unfair" and "deceptive" acts in violation of the Connecticut UTPA.

380.  Plaintiff and Class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

---

[145] Conn. Gen. Stat. § 42-110b(a).

381.   Defendants acted with reckless indifference to another's rights or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others. Therefore, punitive damages are warranted.

382.   Plaintiff also seeks an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Conn. Gen. Stat. § 42-110g(d).

**COUNT NINE**
**VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT**
**("DELAWARE CFA")**
**DEL. CODE TIT. 6, § 2513, *et seq.***
**(Against All Defendants)**

383.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

384.   The Delaware CFA prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."[146]

---

[146] Del. Code tit. 6, § 2513(a).

385.   Each Defendant is a "person" within the meaning of Del. Code tit. 6, § 2511(7).

386.   Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

387.   As alleged in this Complaint, Defendants' conduct with respect to the Analog Insulins violated the Delaware CFA.

388.   Plaintiff seeks damages under the Delaware CFA for injury resulting from the direct and natural consequences of each Defendant's unlawful conduct.[147] Plaintiff also seeks an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

389.   Defendants engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

## COUNT TEN
## VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT ("DISTRICT OF COLUMBIA CPPA")
## D.C. CODE § 28-3901, *et seq.*
## (Against All Defendants)

390.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

---

[147] *See*, *e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980).

391.    The District of Columbia CPPA states: "it shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to," *inter alia*: "(f) fail to state a material fact if such failure tends to mislead"; "(f-1) [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead"; "(j) make false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time"; or "(l) falsely state the reasons for offering or supplying goods or services at sale or discount prices."[148]

392.    Each Defendant is a "person" under D.C. Code § 28-3901(a)(1).

393.    Plaintiff and Class members are "consumers," as defined by D.C. Code § 28-3901(1)(2), who purchased the Analog Insulins.

394.    Defendants' actions as set forth in this Complaint constitute "trade practices" under D.C. Code § 28-3901.

395.    As alleged in this Complaint, Defendants' conduct with respect to the Analog Insulins: "fail[ed] to state a material fact"—the true cost of the Analog Insulins—and that "failure tended to mislead"; "[u]se[d] innuendo or ambiguity as to a material fact, which ha[d] a tendency to mislead"; "ma[d]e false or misleading

---

[148] D.C. Code § 28-3904.

representations of fact concerning the reasons for, existence of, [and/or] amounts of price reductions, or the price in comparison to price of . . . [their] own price at a past or future time"; and "falsely state[d] the reasons for offering or supplying goods or services at sale or discount prices."[149]

396.   Plaintiff and Class members are entitled to recover: treble damages or $1,500, whichever is greater; punitive damages; reasonable attorneys' fees; and any other relief the court deems proper under D.C. Code § 28-3901.

397.   Plaintiff seeks punitive damages against Defendants because Defendants' conduct evidences malice and/or egregious conduct. Defendants misrepresented the actual prices of their Analog Insulins, inflated their benchmark prices, and concealed the reasons for and amount of the rebates offered to the PBMs Defendants to increase profits at the expense of Plaintiff and Class members. Defendants manipulated the prices of their life-saving products without regard to the impact of their scheme on health plans' and beneficiaries' ability to afford medicines necessary to sustain their life. Defendants' conduct constitutes malice warranting punitive damages.

---

[149] *Id.*

## COUNT ELEVEN
## VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT ("FUDTPA")
## FLA. STAT. § 501.201, *et seq.*
## (Against All Defendants)

398.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

399.   The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."[150]

400.   In outlawing unfair acts or practices, the Florida Legislature adopted the FTC's interpretations of § 5(a)(1) of the Federal Trade Commission Act.[151] The Legislature specifically stated that a violation of FUDTPA "may be based upon . . . [t]he standards of unfairness . . . set forth and interpreted by the Federal Trade Commission or the federal courts."[152]

401.   Defendants' conduct, as described in this Complaint, constitutes "deceptive acts" in violation of the FUDTPA.

---

[150] Fla. Stat. § 501.204(1).

[151] *Id.* § 501.204(2).

[152] *Id.* § 501.203(3)(b).

402.   In addition, Defendants' conduct, as described in this Complaint, constitutes "unfair" acts in violation of the FUDTPA.[153]

403.   Plaintiff and Class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

404.   Each Defendant engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

405.   The Florida Legislature has provided that a person who has suffered a loss as a result of a violation of FUDTPA may recover actual damages, plus attorneys' fees and court costs, all of which Plaintiff seeks in this action. Plaintiff is entitled to recover its actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

406.   FUDTPA provides that "[a]nyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."[154] Plaintiff seeks an order enjoining each Defendant's unfair,

---

[153] *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (defining an "unfair practice" under the FDUTPA as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and noting a separate definition for "deception" (internal quotation marks and citation omitted)).

[154] Fla. Stat. § 501.211(1).

unlawful, and/or deceptive practices, declaratory relief, and any other just and proper relief available under the FUDTPA.

## COUNT TWELVE
## VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
## ("GEORGIA UDTPA")
## GA. CODE ANN. § 10-1-370, *et seq.*
## (Against All Defendants)

407.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

408.    The Georgia UDTPA prohibits "deceptive trade practices," which include: "Mak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."[155]

409.    Defendants, Plaintiff, and Class members are "persons" within the meaning of Ga. Code Ann. § 10-1-371(5).

410.    As alleged in this Complaint, Defendants' conduct with respect to the Analog Insulins constitutes making "false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and

---

[155] Ga. Code Ann § 10-1-372(a).

"[e]ngaging in . . . conduct which similarly creates a likelihood of confusion or of misunderstanding."[156]

411.   Plaintiff seeks an order that enjoin each Defendant's unfair, unlawful, and/or deceptive practices, awards attorneys' fees, and awards any other just and proper relief available under Ga. Code Ann. § 10-1-373.

**COUNT THIRTEEN**
**VIOLATION OF THE HAWAII ACT § 480-2(A)**
**HAW. REV. STAT. § 480, *et seq.***
**(Against All Defendants)**

412.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

413. Hawaii Rev. Stat. § 480-2(a) prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

414.   Each Defendant is a "person" under Haw. Rev. Stat. § 480-1.

415.   Plaintiff and Class members are "consumer[s]," as defined by Haw. Rev. Stat. § 480-1, who purchased the Analog Insulins.

---

[156] *Id.*

416.   As alleged in this Complaint, Defendants' conduct with respect to the Analog Insulins constitutes both "unfair" and "deceptive" acts under Haw. Rev. Stat. § 480-2.[157]

417.   Pursuant to Haw. Rev. Stat. § 480-13, Plaintiff seeks monetary relief against each Defendant measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

**COUNT FOURTEEN**
**VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT**
**("IDAHO CPA")**
**IDAHO CODE § 48-601, *et seq.***
**(Against All Defendants)**

418.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

419.   The Idaho CPA prohibits "unfair or deceptive acts or practices, including, but not limited to: "(11) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "(17) Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer"; or "(18) Engaging in any unconscionable method, act or practice in the conduct of trade or commerce."[158]

420.   Each Defendant is a "person" under Idaho Code Ann. § 48-602(1).

---

[157] *Id*.

[158] Idaho Code Ann. § 48-603.

421.   Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code Ann. § 48-602(2).

422.   As alleged in this Complaint, Defendants' conduct with respect to the Analog Insulins constitutes both "unfair" and "deceptive" acts under the Idaho CPA.[159]

423.   Under Idaho Code § 48-608, Plaintiff seeks monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Plaintiff.

424.   Plaintiff also seeks an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

425.   Plaintiff also seeks punitive damages against Defendants because each Defendant's conduct evidences an extreme deviation from reasonable standards. Defendants flagrantly, maliciously, and fraudulently misrepresented the actual cost of their analog insulin products and the existence, purpose, and amount of the rebates granted to the PBM Defendants. They concealed facts that only they knew.

---

[159] *Id.*

Defendants' unlawful conduct constitutes malice, oppression and fraud warranting punitive damages.

**COUNT FIFTEEN**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD**
**AND DECEPTIVE BUSINESS PRACTICES ACT ("ICFA")**
**815 ILL. COMP. STAT. § 505/1, *et seq.***
**(Against All Defendants)**

426.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

427.   ICFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."[160]

428.   That section also provides: "In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."[161]

429.   Each Defendant is a "person" as that term is defined in 815 Ill. Comp. Stat. § 505/1(c).

---

[160] 815 Ill. Comp. Stat. § 505/2.

[161] *Id.*

430.   Plaintiff and Class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. § 505/1(e).

431.   Defendants' conduct, as described in this Complaint, constitutes "deceptive acts" in violation of the ICFA.

432.   In addition, Defendants' conduct, as described in this Complaint, constitutes "unfair" acts in violation of the ICFA.[162]

433.   The ICFA allows "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person [to] bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . ."[163] Pursuant to this provision of the code, Plaintiff seeks monetary relief against each Defendant in the amount of actual damages, as well as punitive damages because Defendants each acted with fraud and/or malice and/or was grossly negligent.

434.   Plaintiff also seeks an order enjoining each Defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq.*

---

[162] *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (stating that "[a] plaintiff is entitled to recovery under ICFA when there is unfair or deceptive conduct" and "may allege that conduct is unfair . . . without alleging that the conduct is deceptive").

[163] 815 Ill. Comp. Stat. § 505/10a.

## COUNT SIXTEEN
## VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
### ("KANSAS CPA")
### KAN. STAT. § 50-623, *et seq.*
### (Against All Defendants)

435.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

436.    The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction."[164] Deceptive acts or practices include, but are not limited to: "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact"; "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact"; and "making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions."[165] These acts constitute deceptive conduct "whether or not any consumer has in fact been misled."[166]

437.    Plaintiff and Class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased insulin.

---

[164] Kan. Stat. § 50-626(a).

[165] *Id.* § 50-626(b).

[166] *Id.*

438.   The sale of insulin was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

439.   Defendants' conduct, as described in this Complaint, constitutes "deceptive" practices in violation of the Kansas CPA.

440.   Under Kan. Stat. Ann. § 50-634, Plaintiff seeks monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Class member.

441.   Plaintiff also seeks an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623, *et seq.*

## COUNT SEVENTEEN
## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ("LOUISIANA CPL") LA. REV. STAT. § 51:1401, *et seq.* (Against All Defendants)

442.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

443.   The Louisiana CPL makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."[167]

---

[167] La. Rev. Stat. § 51:1405(A).

444.    Defendants, Plaintiff, and Class members are "persons" within the meaning of La. Rev. Stat. § 51:1402(8).

445.    Plaintiff and Class members are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

446.    Each Defendant engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(9).

447.    Defendants' conduct, as described in this Complaint, constitutes both "deceptive" and "unfair" practices in violation of the Louisiana CPL.

448.    Pursuant to La. Rev. Stat. § 51:1409, Plaintiff seeks to recover actual damages in an amount to be determined at trial; treble damages for knowing violations of the Louisiana CPL; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

## COUNT EIGHTEEN
## VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT ("MARYLAND CPA")
## MD. COM. LAW Code § 13-101, *et seq.*
## (Against All Defendants)

449.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

450.    The Maryland CPA provides that a person may not engage in any unfair or deceptive trade practice, including: "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which

has the capacity, tendency, or effect of deceiving or misleading consumers"; "Failure to state a material fact if the failure deceives or tends to deceive"; "False or misleading representation[s] of fact which concern[] . . . [t]he reason for or the existence or amount of a price reduction"; and "Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same."[168] The statute further provides that a person may not engage in such conduct regardless of whether the consumer is actually deceived or damaged.[169]

451.    Defendants, Plaintiff, and Class members are "persons" within the meaning of Md. Code, Com. Law § 13-101(h).

452.    Defendants' conduct, as described in this Complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Maryland CPA.

453.    Pursuant to Md. Code, Com. Law § 13-408, Plaintiff seeks actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

454.    Plaintiff also seeks an order enjoining each Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under Md. Code, Com. Law § 13-406.

---

[168] Md. Code, Com. Law § 13-301.

[169] *Id.* § 13-302.

## COUNT NINETEEN
## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
## ("MICHIGAN CPA")
## MICH. COMP. LAWS § 445.902, *et seq.*
## (Against All Defendants)

455.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

456.   The Michigan CPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."[170]

457.   Plaintiff and Class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

---

[170] Mich. Comp. Laws § 445.903(1).

458.   Each Defendant is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

459.   Defendants' conduct, as described in this Complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Michigan CPA.

460.   Plaintiff seeks: injunctive against Defendants to prevent their continuing unfair and deceptive acts; monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

461.   Plaintiff also seeks punitive damages because each Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants maliciously and egregiously misrepresented the actual price of their Analog Insulins, inflated their list prices, and concealed the reasons for and amount of the rebates offered to the PBM Defendants to increase their profits at the expense of consumers and payors. Defendants manipulated the price of their life-saving products without regard to the impact of their scheme on consumers' or payors' ability to afford a life-saving product. Defendants' conduct constitutes malice, oppression, and fraud, warranting punitive damages.

## COUNT TWENTY
## VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT ("MINNESOTA CFA") MINN. STAT. § 325F.68, *et seq.* (Against All Defendants)

462.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

463.   The Minnesota CFA prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."[171]

464.   Each purchase of analog insulin constitutes "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

465.   Defendants' conduct, as described in this Complaint, constitutes "deceptive" acts or practices in violation of the Minnesota CFA.

466.   Pursuant to Minn. Stat. § 8.31(3a), Plaintiff seeks actual damages, attorneys' fees, injunctive relief, and any other just and proper relief available under the Minnesota CFA.

---

[171] Minn. Stat. § 325F.69(1).

467.    Plaintiff also seeks punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that each Defendant's acts showed deliberate disregard for the rights or safety of others.

## COUNT TWENTY-ONE
## VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT ("MINNESOTA DTPA") MINN. STAT. §§ 325D.43-48, *et seq.* (Against All Defendants)

468.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

469.    The Minnesota DTPA prohibits deceptive trade practices, which occur when a person "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."[172]

470.    Defendants' conduct, as described in this complaint, constitutes "deceptive" acts or practices in violation of the Minnesota DTPA.

471.    Pursuant to Minn. Stat. §§ 325 D.45, F.70, Plaintiff seeks actual damages, attorneys' fees, injunctive relief, and any other just and proper relief available under the Minnesota DTPA.

---

[172] Minn. Stat. § 325D.44(11), (13).

472.   Plaintiff also seeks punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that each defendant's acts showed deliberate disregard for the rights or safety of others.

## COUNT TWENTY-TWO
## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
## ("MISSOURI MPA")
## MO. REV. STAT. § 407.010, *et seq.*
## (Against All Defendants)

473.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

474.   The Missouri MPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise."[173]

475.   Defendants, Plaintiff, and Class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

476.   Defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

477.   Defendants' conduct, as described in this Complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Missouri MPA.

---

[173] Mo. Rev. Stat. § 407.020.1.

478.   Defendants are liable to Plaintiff and Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining each Defendant's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## COUNT TWENTY-THREE
## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
## ("NEBRASKA CPA")
## NEB. REV. STAT. § 59-1601, *et seq.*
## (Against All Defendants)

479.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

480.   The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[174]

481.   Defendants, Plaintiff, and Class members are "person[s]" under Neb. Rev. Stat. § 59-1601(1).

482.   Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

483.   Defendants' conduct, as described in this Complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Nebraska CPA.

---

[174] Neb. Rev. Stat. § 59-1602.

484.    Because Defendants' conduct caused injury to the property of Plaintiff and Class members through violations of the Nebraska CPA, Plaintiff seeks recovery of: actual damages, as well as enhanced damages up to $1,000; an order enjoining each Defendant's unfair or deceptive acts and practices; costs of Court; reasonable attorneys' fees; and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

## COUNT TWENTY-FOUR
## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
## ("NEVADA DTPA")
## NEV. REV. STAT. § 598.0903, *et seq.*
## (Against All Defendants)

485.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

486.    The Nevada DTPA prohibits deceptive trade practices. The statute provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "[m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions"[175]; "[k]nowingly makes any other false representation in a transaction"[176]; "[f]ails to disclose a material fact in connection

---

[175] Nev. Rev. Stat. § 598.0915.

[176] *Id.*

with the sale or lease of goods or services"[177]; and/or "[m]akes an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, unless, at the time the assertion is made, the person making it has possession of factually objective scientific, clinical or quantifiable evidence which substantiates the assertion."[178]

487.    Defendants' conduct, as described in this Complaint, constitutes "deceptive" acts or practices in violation of the Nevada CTPA.

488.    Plaintiff seeks actual damages, punitive damages, an order enjoining Defendants' deceptive acts or practices, costs of court, attorneys' fees, and all other appropriate and available remedies under Nev. Rev. Stat. § 41.600.

## COUNT TWENTY-FIVE
## VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT ("NEW HAMPSHIRE CPA")
## N.H. REV. STAT. § 358-A:1, *et seq.*
## (Against All Defendants)

489.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

490.    The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from "using any unfair or deceptive act or practice," including, but not limited to: "[m]aking false or misleading statements of fact concerning the

---

[177] *Id.* § 598.0923.

[178] *Id.* § 598.0925.

reasons for, existence of, or amounts of price reductions" and/or "[p]ricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition."[179]

491.    Defendants, Plaintiff, and Class members are "persons" under N.H. Rev. Stat. § 358-A:1.

492.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

493.    Defendants' conduct, as described in this Complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the New Hampshire CPA.

494.    Because Defendants' willful conduct caused injury to the property of Plaintiff and Class members through violations of the New Hampshire CPA, Plaintiff seeks recovery of: actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; an order enjoining each Defendant's unfair and/or deceptive acts and practices; and any other just and proper relief under N.H. Rev. Stat. § 358-A:10.

---

[179] N.H. Rev. Stat. § 358-A:2.

## COUNT TWENTY-SIX
## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
## ("NJCFA")
## N.J. STAT. ANN. § 56:8-1, *et seq.*
## (Against All Defendants)

495.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

496.   The NJCFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ."[180]

497.   Defendants, Plaintiff and Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

498.   Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

---

[180] N.M. Stat. Ann. § 57-12-2(D).

499.   As described above, Defendants' conduct, as described in this complaint, constitutes "deceptive," "unfair," and "unconscionable" acts or practices in violation of the NJCFA.

500.   This wrongful conduct by Defendants, coupled with the damage Plaintiff and Class members incurred, entitles members of the Class to relief under the NJCFA. Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . ."[181] "In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, . . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."[182]

501.   Therefore, Plaintiff and Class members are entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

---

[181] N.M. Stat. Ann. § 57-12-2(D).
[182] N.M. Stat. Ann. § 57-12-2(D).

## COUNT TWENTY-SEVEN
## VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT ("NEW MEXICO UTPA")
## N.M. STAT. § 57-12-1, *et seq.*
## (Against All Defendants)

502.  Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

503.  The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale . . . of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including, but not limited to: "making false or misleading statements of fact concerning the price of goods or services, the prices of competitors or one's own price at a past or future time or the reasons for, existence of or amounts of price reduction"; "making false or misleading statements of fact for the purpose of obtaining appointments for the demonstration, exhibition or other sales presentation of goods or services"; and/or "failing to state a material fact if doing so deceives or tends to deceive."[183]

504.  The New Mexico UTPA further makes unlawful "unconscionable trade practice[s]," meaning "an act or practice in connection with the sale . . . or in connection with the offering for sale . . . of any goods or services, . . . that to a

---

[183] N.M. Stat. Ann. § 57-12-2(D).

person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid."[184]

505.   Defendants, Plaintiff, and Class members are "person[s]" under N.M. Stat. § 57-12-2.

506.   Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. § 57-12-2.

507.   Defendants' conduct, as described in this Complaint, constitutes a pattern of "false or misleading oral or written statement[s]" in violation of N.M. Stat. Ann. § 57-12-2(D).

508.   Defendants' conduct, as described in this Complaint, also constitutes a pattern of "unconscionable trade practice[s]" in violation of N.M. Stat. Ann. § 57-12-2(E).

509.   Because Defendants' false, unconscionable, and willful conduct caused actual harm to Plaintiff and Class members, Plaintiff seeks recovery of: actual damages or $100, whichever is greater; discretionary treble damages; punitive damages; reasonable attorneys' fees and costs; injunctive relief, and all other proper and just relief available under N.M. Stat. § 57-12-10.

---

[184] *Id.* at § 57-12-2(E).

## COUNT TWENTY-EIGHT
## VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW ("NEW YORK GBL") N.Y. GEN. BUS. LAW §§ 349-350 (Against All Defendants)

510.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

511.   The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."[185]

512.   Plaintiff and Class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

513.   Each Defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

514.   Defendants' conduct, as described in this Complaint, constitutes deceptive acts in violation of the New York GBL.

515.   Defendants' deceptive acts and practices, which were intended to mislead health plans who cover analog insulin purchases for their members, constitutes conduct directed at consumers.

516.   Because Defendants' willful and knowing conduct caused injury to Plaintiff and Class members, Plaintiff seeks recovery of: actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages;

---

[185] N.Y. Gen. Bus. Law § 349.

reasonable attorneys' fees and costs; an order enjoining Defendants' unlawful conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT TWENTY-NINE
## VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT ("NCUDTPA")
## N.C. GEN. STAT. § 75-1.1, *et seq.*
## (Against All Defendants)

517.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

518.   The NCUDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."[186]

519.   Defendants' conduct, as described in this Complaint, constitutes "deceptive acts" in violation of the NCUDTPA.

520.   In addition, Defendants' conduct, as described in this Complaint, constitutes "unfair" acts in violation of the NCUDTPA.[187]

---

[186] N.C. Gen. Stat. § 75-1.1(a).

[187] *Melton v. Family First Mortg. Corp.*, 576 S.E.2d 365, 368 (2003) ("A practice is unfair [under the NCUDTPA] when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" and offering a separate definition for "deceptive" practices (internal quotation marks and citations omitted)).

521.   Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

522.   Section 75-16 of the NCUDTPA provides injured persons with a private right of action and automatic trebling of damages: "If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of Plaintiff and Class members and against Defendants for treble the amount fixed by the verdict."[188]

523.   Plaintiff seeks an order trebling the actual damages to Plaintiff and Class members, an order enjoining Defendants' unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

---

[188] N.C. Gen. Stat. § 75-16.

## COUNT THIRTY
## VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
## ("NORTH DAKOTA CFA")
## N.D. CENT. CODE § 51-15-02
## (Against All Defendants)

524.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

525.   The North Dakota CFA makes unlawful the "act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice."[189] The statute further provides that the "act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, is declared to be an unlawful practice."[190]

526.   Defendants, Plaintiff, and members are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

---

[189] N.D. Cent. Code § 51-15-02.

[190] *Id.*

527.   Defendants engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(3), (5).

528.   Defendants' conduct, as described in this Complaint, constitutes "deceptive acts" in violation of the North Dakota CFA.

529.   In addition, Defendants' conduct, as described in this Complaint, constitutes "unconscionable conduct" acts in violation of the North Dakota CFA.

530.   Defendants knowingly committed the conduct described above. As a result, under N.D. Cent. Code § 51-15-09, Defendants are liable to Plaintiff and Class members for treble damages in amounts to be proven at trial, attorneys' fees, costs, and disbursements. Plaintiff further seeks an order enjoining each Defendant's unfair and/or deceptive acts or practices as well as other just and proper available relief under the North Dakota CFA.

## COUNT THIRTY-ONE
## VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT ("OHIO CSPA")
## OHIO REV. CODE ANN. § 1345.01, *et seq.*
## (Against All Defendants)

531.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

532.   The Ohio CSPA broadly prohibits "unfair or deceptive act[s] or practice[s] in connection with a consumer transaction."[191] Specifically, and without limitation on the broad prohibition, the Ohio CSPA prohibits suppliers from representing that "a specific price advantage exists, if it does not."[192]

533.   Each Defendant is a "supplier" as that term is defined in Ohio Rev. Code Ann. § 1345.01(C).

534.   Plaintiff and Class members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D).

535.   The relevant health plan payments for Analog Insulins are "consumer transaction[s]" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

536.   Defendants' conduct, as described in this Complaint, constitutes "deceptive acts" in violation of the Ohio CSPA.

537.   In addition, Defendants' conduct, as described in this Complaint, constitutes "unfair" acts in violation of the Ohio CSPA.

538.   As a result of Defendants' wrongful conduct, Plaintiff and Class members have been damaged in an amount to be proven at trial. It will seek all just and proper remedies, including, but not limited to: actual and statutory damages, an order enjoining Defendants' deceptive and unfair conduct, treble damages, court

---

[191] Ohio Rev. Code Ann. § 1345.02.

[192] *Id.*

costs, and reasonable attorneys' fees, pursuant to Ohio Rev. Code Ann. § 1345.09, *et seq.*

## COUNT THIRTY-TWO
## VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
## ("OKLAHOMA CPA")
## OKLA. STAT. TIT. 15, § 751, *et seq.*
## (Against All Defendants)

539.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

540.    The Oklahoma CPA declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: making "false or misleading statements of fact, knowingly or with reason to know, concerning the price of the subject of a consumer transaction or the reason for, existence of, or amounts of price reduction"[193] and/or "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[194]

541.    The Oklahoma CPA further provides that if "[t]he commission of any act or practice declared to be a violation of the Consumer Protection Act" "is also found to be unconscionable," the violator is liable to the aggrieved customer for the payment of a civil penalty, recoverable in an individual action only, in a sum set by

---

[193] Okla. Stat. tit. 15, § 753.

[194] *Id.* § 752.

the court of not more than Two Thousand Dollars ($2,000.00) for each violation."[195]

"In determining whether an act or practice is unconscionable the following circumstances shall be taken into consideration by the court: (1) whether the violator knowingly or with reason to know, took advantage of a consumer reasonably unable to protect his or her interests because of his or her age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) whether, at the time the consumer transaction was entered into, the violator knew or had reason to know that price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by like consumers; . . . [and] (4) whether the violator knew or had reason to know that the transaction he or she induced the consumer to enter into was excessively one-sided in favor of the violator."[196]

542.    Plaintiff and Class members are "persons" under Okla. Stat. tit. 15, § 752.

543.    Each Defendant is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15, § 15-751(1).

---

[195] *Id.* § 761.1.

[196] *Id.*

544.   The sale of insulin was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and each Defendant's actions as set forth herein occurred in the conduct of trade or commerce.

545.   Defendants' conduct, as described in this Complaint, constitutes "false or misleading statements" in violation of the Oklahoma CPA. Defendants' conduct, as described in this Complaint, further constitutes practices that are immoral, unethical, oppressive, unscrupulous or substantially injurious to health plans in violation of the Oklahoma CPA.

546.   Defendants' conduct as alleged herein was also unconscionable because (1) Defendants, knowingly or with reason to know, took advantage of health plans reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) Defendants knew or had reason to know that their list prices grossly exceeded the prices at which similar property or services were readily obtainable in similar transactions by like consumers; and (3) Defendants knew or had reason to know that the transactions they induced the health plans to enter were excessively one-sided in favor of each Defendant.

547.   Plaintiff seeks punitive damages because Defendants' conduct was egregious. Defendants misrepresented the actual prices of their Analog Insulins, inflated their list prices, and concealed the reasons for and amount of the rebates

offered to the PBM Defendants to increase profits at the expense of consumers and payors. They manipulated the prices of their life-saving Analog Insulins without regard to the impact of their scheme on health plans and their ability to provide healthcare to their participants Defendants' egregious conduct warrants punitive damages.

548.  Furthermore, because Defendants' unconscionable conduct caused injury to Plaintiff and Class members, Plaintiff seeks recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees under Okla. Stat. tit. 15, § 761.1. Plaintiff further seeks an order enjoining each Defendant's unfair and/or deceptive acts or practices and any other just and proper relief available under the Oklahoma CPA.

**COUNT THIRTY-THREE**
**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT"**
**("OREGON UTPA")**
**OR. REV. STAT. § 646.605, _et seq._**
**(Against All Defendants)**

549.  Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

550.  The Oregon UTPA prohibits a person from, in the course of the person's business: making "false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions"; making "false or misleading representations of fact concerning the offering price of, or the person's

cost for . . . goods"; or engaging "in any other unfair or deceptive conduct in trade or commerce."[197]

551.  Each Defendant is a person within the meaning of Or. Rev. Stat. § 646.605(4).

552.  Each Analog Insulin is a "good" obtained primarily for personal family or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

553.  Defendants' conduct, as described in this Complaint, constitutes "false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions" on the Analog Insulins; "false or misleading representations of fact concerning the offering price of, or the person's cost for" the Analog Insulins; and "unfair or deceptive conduct."[198]

554.  Plaintiff and Class members are entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1). Plaintiff and Class members are also entitled to punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others. Plaintiff further seeks an order enjoining each Defendant's unfair and/or deceptive acts or practices and any other just and proper relief available under Or. Rev. Stat. §§ 646.632, 636.

---

[197] Or. Rev. Stat. § 646.608(1).

[198] *Id.*

## COUNT THIRTY-FOUR
## VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT ("SOUTH CAROLINA UTPA") S.C. CODE ANN. § 39-5-10, *et seq.* (Against All Defendants)

555.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

556.   The South Carolina UTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[199]

557.   Each Defendant is a "person" under S.C. Code Ann. § 39-5-10.

558.   Defendants' conduct, as described in this Complaint, constitutes "deceptive acts" in violation of the South Carolina UTPA.

559.   In addition, Defendants' conduct, as described in this Complaint, constitutes "unfair" acts in violation of the South Carolina UTPA.

560.   Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiff seeks monetary relief to recover their economic losses. Because Defendants' actions were willful and knowing, Plaintiff's and Class Members' damages should be trebled.

561.   Plaintiff further alleges that Defendants' malicious and deliberate conduct warrants an assessment of punitive damages because Defendants carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants misrepresented the actual prices of the Analog Insulins, inflated

---

[199] S.C. Code Ann. § 39-5-20(a).

their benchmark prices, and concealed the reasons for and amount of the rebates offered to the PBM Defendants to increase their profits at the expense of health plans and consumers. They manipulated the prices of their life-saving products without regard to the impact of their scheme on health plans and their ability to provide benefits to their participants. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

562.  Plaintiff further seeks an order enjoining each Defendant's unfair or deceptive acts or practices.

### COUNT THIRTY-FIVE
### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
### ("TENNESSEE CPA")
### TENN. CODE ANN. § 47-18-101, *et seq.*
### (Against All Defendants)

563.  Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

564.  Tennessee CPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."[200]

---

[200] Tenn. Code Ann. § 47-18-104.

565.   Plaintiff and Class members are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(2).

566.   Each Defendant is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

567.   Each Defendant's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

568.   Defendants' conduct, as described in this Complaint, constitutes "deceptive acts" in violation of the Tennessee CPA.

569.   Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiff seeks monetary relief against each Defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT THIRTY-SIX
## VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT
## ("UTAH CSPA")
## UTAH CODE § 13-11-1, *et seq.*
## (Against All Defendants)

570.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

571.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including, but not limited to, "indicat[ing] that a specific price advantage exists, if it does not."[201]

572.   "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.[202]

573.   As alleged in this Complaint, Defendants have engaged in deceptive acts in violation of the Utah CSPA.

574.   They have also engaged in unconscionable actions in violation of the Utah CSPA. Defendants knew, or had reason to know, that health plans would rely on their reported list price as the prices of their analog insulin. And they knew that these list prices were not fair or reasonable approximations of the actual cost of those Analog Insulins.

575.   Pursuant to Utah Code Ann. § 13-11-4, Plaintiff seeks: monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

---

[201] Utah Code § 13-11-4.

[202] *Id.* § 13-11-5.

## COUNT THIRTY-SEVEN
## VIOLATION OF THE VERMONT CONSUMER FRAUD ACT
## ("VERMONT CFA")
## VT. STAT. ANN. TIT. 9, § 2451 *et seq.*
## (Against All Defendants)

576.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

577.   The Vermont CFA makes unlawful "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."[203]

578.   Defendants were sellers within the meaning of Vt. Stat. Ann. tit. 9, § 2451(a)(c).

579.   Defendants' conduct, as described in this Complaint, constitutes "deceptive acts" in violation of the Vermont CFA.

580.   Defendants' conduct, as described in this Complaint, constitutes "unfair acts" in violation of the Vermont CFA.

581.   Plaintiff is entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]," pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

---

[203] Vt. Stat. Ann. tit. 9, § 2453(a).

## COUNT THIRTY-EIGHT
## VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT ("VIRGINIA CPA") VA. CODE ANN. § 59.1-196, *et seq.* (Against All Defendants)

582.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

583.   The Virginia CPA lists prohibited "fraudulent acts or practices" which include: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."[204]

584.   Each Defendant is a "supplier" under Va. Code Ann. § 59.1-198.

585.   Defendants' advertisements of the Analog Insulins' list prices were "consumer transactions" within the meaning of Va. Code Ann. § 59.1-198.

586.   Defendants' conduct, as described in this Complaint, constitutes "fraudulent acts" in violation of the Virginia CPA.

587.   Pursuant to Va. Code Ann. § 59.1-204, Plaintiff seeks monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Class member. Because Defendants' conduct was committed willfully and

---

[204] Va. Code Ann. § 59.1-200.

knowingly, Plaintiff is entitled to recover, for each Class member, the greater of (a) three times actual damages or (b) $1,000.

588.   Plaintiff also seeks an order enjoining each Defendant's unfair and/or deceptive acts or practices, punitive damages, attorneys' fees, and any other just and proper relief available under Va. Code Ann. § 59.1-204, *et seq*.

## COUNT THIRTY-NINE
## VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT ("WISCONSIN DTPA") WIS. STAT. § 100.18
## (Against All Defendants)

589.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

590.   The Wisconsin DTPA prohibits a "representation or statement of fact which is untrue, deceptive or misleading."[205]

591.   Each Defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

592.   Plaintiff and Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).

---

[205] Wis. Stat. § 100.18(1).

593.   Defendants' conduct, as described in this Complaint, constitutes "representation[s] or statement[s] of fact which [were] untrue, deceptive or misleading" in violation of the Wisconsin DTPA.

594.   Plaintiff and Class members are entitled to damages and other relief provided for under Wis. Stat. § 100.18(11)(b)(2). Because Defendants' conduct was committed knowingly and/or intentionally, Plaintiff is entitled to treble damages.

595.   Plaintiff also seeks court costs and attorneys' fees under Wis. Stat. § 110.18(11)(b)(2).

## IX.   DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully demand that this Court:

A.     Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiff as the representative of the Class;

B.     Enter judgments against Defendants and in favor of Plaintiff and the Class;

C.     Award the Class damages (i.e., three times overcharges) in an amount to be determined at trial;

D.      Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

E.      Enjoin the Manufacturer Defendants from continuing to report artificially inflated list prices that do not approximate their true net prices to the PBM Defendants.

F.      Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## X.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of itself and the proposed Class, demand a trial by jury on all issues so triable.


DATED: October 5, 2023          Respectfully submitted,


/s/ James E. Cecchi
James E. Cecchi
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: (973) 994-1700

Joseph H. Meltzer
Melissa L. Yeates
Terence S. Ziegler
Ethan J. Barlieb
Lisa Lamb Port
Varun Elangovan

**KESSLER TOPAZ**
 **MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
jmeltzer@ktmc.com
myeates@ktmc.com
tziegler@ktmc.com
ebarlieb@ktmc.com
llambport@ktmc.com
velangovan@ktmc.com

*Attorneys for Plaintiff*